1  BRUCE "MAX" DAVIS
2  30765 Pacific Coast Hwy #273
   Malibu, CA 90265
3  Telephone: (424) 781-0301
   Facsimile: (888) 512-9133
4
5  Plaintiff in Pro Se



FILED
CLERK, U.S. DISTRICT COURT

MAR 3 0 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

6

7              UNITED STATES DISTRICT COURT

8        FOR THE CENTRAL DISTRICT OF CALIFORNIA

9                    WESTERN DIVISION

10

11  BRUCE "MAX" DAVIS, an          CASE NO **CV11-02674**
    individual                                  PA ( FFMx)
12
13              Plaintiff,
14                                  **COMPLAINT FOR DAMAGES**
      vs.
15  AT&T Wireless Services Inc. a   **1. Sherman Antitrust Act 15 U.S.C. §
    Delaware Corporation; Cellco       1 et seq. (Conspiracy);**
16  Partnership dba Verizon Wireless a **2. Sherman Antitrust Act 15 U.S.C. §
    New Jersey Corporation; Sprint     1 et seq. (Horizontal Restraint of
17  Spectrum LP, A Delaware Limited    Trade);**
    Partnership; T-Mobile, USA a    **3. Sherman Antitrust Act 15 U.S.C. §
18  Washington Corporation; TracFone   1 et seq. (Horizontal Price Fixing);**
    Wireless Inc. A Delaware        **4. Violations of the Federal Trade Act
19  Corporation: & Does 1 to 10,       (Title 15 Section 45);**
    inclusive.                      **5. Collusion Out of Scope From
20                                     Standard Development Activities
21              Defendants.            (Title 15 U.S.C §4301);**
                                    **6. Unfair Competition – Cal. B&P
22                                     Code §17200 et seq.**
23                                     **Demand for Jury Trial**
24
25
26
27  Plaintiff Bruce "Max" Davis complains and alleges as follows:
28

1
COMPLAINT

## The Parties

1.  Plaintiff "Max" Davis aka Bruce Davis is an individual who resides in the
    County of Los Angeles, State of California.

2.  Plaintiff is informed and believes and based thereon allege, that Defendant
    AT&T Wireless Services Inc. is a Delaware Corporation doing business in
    the State of California.

3.  Plaintiff is informed and believes, and based thereon allege, that Defendant
    Cellco Partnership dba Verizon Wireless is a New Jersey Corporation doing
    business in the State of California.

4.  Plaintiff is informed and believes and based thereon allege, that Defendant
    Sprint Spectrum LP is a Delaware Limited Partnership doing business in the
    State of California.

5.  Plaintiff is informed and believes and based thereon allege, that Defendant
    T-Mobile, USA a Washington Corporation is doing business in the State of
    California.

6.  Plaintiff is informed and believes and based thereon allege, that Defendant
    TracFone Wireless Inc. is a Delaware Corporation doing business in the
    State of California.

7.  Plaintiff does not presently know the true names and capacities of defendants
    Does 1-10, inclusive and for that reason sues such defendants under fictitious
    names.  Plaintiff will amend this Complaint to show their true names and

capacities when they have been ascertained.

8.  Plaintiff is informed and believes and based thereon alleges that sometime prior hereto, Defendants (collectively, "Wireless Carriers") and each of them willfully engaged in the course of conduct described herein. Plaintiff is further informed and believes and based thereon alleges that in pursuance of said course of conduct described herein, the Defendants and each of them did the acts and/or conspired in enabling the events herein alleged. The Defendants and each of them profited and continue to profit from the conspiracy herein alleged.

## Jurisdiction and Venue

9.  Plaintiff brings this action under 15 U.S.C §§ 5, 15, 16 and 26 to recover injunctive relief, treble damages and costs of suit including expert fees and costs as a result of Defendants' violation of Section 1 of the Sherman Act (15 U.S.C. § 1). To the extent this complaint contains claims for relief under California law; those claims are specifically authorized to be brought in this Court under the provisions of 28 U.S.C. §§ 1338(a) and 1338(b)

10. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 9, 15 and 26) and Section 4 of the Sherman Act.

11. This court has personal jurisdiction over Defendants as they are conducting business in the State of California by among other things offering wireless services and owning mobile networks that function in the State of California

1   as well as launching other business ventures here.

2

3   12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 28 U.S.C. §

4   1400.

5

6   13. Venue is proper in the State of California as the wrongful actions

7   complained of herein were and are being committed in this judicial district.

8

9   **Nature and Facts of the Action**

10

11   14. This is an antitrust action charging Defendants with a conspiracy via

12   collusion to horizontally divide the market, allocate the market, fix prices

13   and undermine an entire industry sector by providing new multimedia

14   distribution systems that exploit and devalue recorded multimedia content

15   produced by Plaintiff, artists and others similarly situated by deploying these

16   new systems without any standard technical measures to protect copyrighted

17   works.  Defendants purposely conspired via collusion to install themselves

18   as the new primary gate keepers and sole beneficiaries of multimedia content

19   sharing through their new MMS technologies.  These technologies enable

20   their end users to freely distribute Plaintiff's and others' multimedia content

21   peer to peer at will.  The Defendants are indeed competitors (American

22   Needle v. the NFL[1]) yet their conspired efforts to exclude the Plaintiff, artists

23   and others from the preferred and growing marketplace of multimedia

24   content sharing financial benefit is a classic example of an agreement to

25   horizontally divide the marketplace in violation of Title 15 §1 of the

26   _____

27   [1] AMERICAN NEEDLE, INC. v. NATIONALFOOTBALL LEAGUE ( No. 08-661 ) 538 F. 3d 736

28

1   Sherman Act.  The Defendants have purposely, collectively and clearly

2   drawn a line separating their benefits and circumstances from the actual

3   providers of the content they need to stock their new systems of multimedia

4   peer to peer file-sharing for only their financial benefit.  Plaintiff will show

5   that the Defendants have conspired to hide behind the DMCA[2] safe harbor

6   rules for service providers however, as the Defendants already know, they do

7   not qualify as a service provider as defined in the Telecommunications Act[3]

8   while providing a sub-system exclusively for the file-sharing of others'

9   copyrighted materials.  This conspiracy via collusion to divide the market

10   and fix the price paid to Plaintiff, artists and other content providers at zero

11   for multimedia file-sharing revenue has resulted in diminished and unfair

12   competition, restraint of trade and a very serious undermining of Plaintiff's

13   and others' ability to provide and profit from producing recorded multimedia

14   content going forward in any market.

## B. Definitions

15.  "DRM" means digital rights management, a technology that protects data
     and digital content

16.  "MMS" means multimedia messaging system, a dedicated sub-system of
     mobile networks for file-sharing of data versions of multimedia

---

[2] The Digital Millennium Copyright Act of 1998 amended Title 17 U.S.C.

[3] The Telecommunications Act of 1996-104[th] Congress of the United States

17. "MMS capable device" means a mobile device or 3G data terminal that can send and receive multimedia messages like videos, music, images and graphics

18. "peer to peer file-sharing" means the direct sharing of data and digital files between persons via computer nodes or mobile devices

19. "SDO" means standards development organization, a domestic or international organization that plans, develops, establishes, or coordinates voluntary consensus standards........

## C. Preliminary History

20. The Plaintiff is a developer and investor in digital applications, multimedia content, mobile multimedia applications and Internet related properties. Plaintiff is also the founder of two not for profit trade associations. These organizations were founded to uphold content creators' and content providers' rights in the Defendants' newly deployed mobile multimedia messaging system (MMS) of file-sharing. Plaintiff began this mission by submitting petitions for rulemaking to the FCC[4] and the Copyright Royalty Board[5] in 2008. See the attached (Exhibit A) as "Petitions and Communications". Plaintiff also solicited United States Senate and House judiciary committee members amongst others for help in introducing legislation to deal with the still unresolved issues of multimedia file-sharing

---

[4] The Federal Communications Commission est. by the Communications Act of 1934

[5] The CRB est. by the Copyright Royalty and Distribution Act of 2004 (2005)

systems on mobile networks. Plaintiff has invested substantial resources in developing digital applications, multimedia products, mobile multimedia products and Internet related properties. Plaintiff has also invested a substantial amount of time, energy and financial resources advocating the progressive merging of new MMS technologies and U.S. Copyright laws.

21. The conspiracy by the Defendants to undermine the value of paid for multimedia content which also results in the undermining of the U.S. Copyright system has made it near impossible for Plaintiff to receive any return on his investments, raise any capital backing for the providing of content and has seriously impeded the development of Plaintiff's membership growth for the organizations Plaintiff has funded to address these issues.

22. Plaintiff's estimated losses from the Defendants' activities is a minimum of $185,000 in unrecovered MMS investments caused by the Defendants' conspiracy to undermine Plaintiff's and others' ability to sell multimedia content in the current marketplace. However, that amount may be much higher when taking into account what the Defendants have earned via data revenue from the very same content that earned nothing for the Plaintiff because Plaintiff was locked out from those earnings. The attached documents (Exhibit B) support the minimum injury and the potential maximum injury to the Plaintiff as a result of the Defendants' illegal activities.

23. The Defendants provide wireless telecommunications services for their customers. The Defendants have recently also become multimedia content providers of sorts to their customer base. The Defendants do not create nor

1   do they produce the multimedia content however, the Defendants do contract
2   with 3rd parties that actually produce the commercial content the Defendants
3   offer their customer base.

4

5   24. Plaintiff can show that recently the Defendants developed and deployed a
6   content distribution system of their own that enables their customer base or
7   end users to share multimedia content at will via a multimedia file-sharing
8   system known as MMS.  The transmission and publication of copyright
9   protected multimedia is not covered by the exemption for service providers
10  as set forth in Title 17 U.S.C §512 et seq.  Although the Defendants are
11  providing a sub-system dedicated exclusively to copyrighted multimedia
12  file-sharing (Exhibit C) the Defendants conspired to act as if they still
13  qualified as dumb pipelines for these activities.  The Defendants collectively
14  have done nothing to accommodate standard technical measures designed to
15  protect copyrighted works on their new system of MMS.

16

17  25. It is important to understand that any multimedia content may be converted
18  to an MMS version to be transported, shared and published peer to peer on
19  the Defendants' new MMS system.  For example, a 30 second ringtone in
20  the popular mp3 format can be converted to an MMS version in less than 15
21  seconds.

22

23  26. Plaintiff will show the Defendants have conspired to financially benefit from
24  the sharing of others' copyrighted materials including content from 3rd party
25  content providers with whom Defendants have contracted whereby once the
26  3rd party's content has been initially distributed it may be transported and
27  published an unlimited number of times via the Defendant's file-sharing
28  system.  While the Defendants financially benefit from these activities

1    outside of the contract, the 3rd party content provider gets nothing from these

2    activities by design.

3

4    27. Plaintiff can prove the Defendants do have the means to prevent and/or

5        control the unfettered distribution of others' content on their new MMS

6        system; however Defendants do not want to prevent their end users from

7        transporting and freely publishing others' copyrighted content because the

8        Defendants are making many times over the dollar amounts contracted with

9        3rd party providers by doing nothing to control these activities because it runs

10       up data usage by consumers. At the same time Defendants are seriously

11       diminishing the value of 3rd party content providers' content by enabling and

12       inducing these activities that drive up data usage revenue for the Defendants.

13       In fact, at this years opening session of the 2011 CTIA Wireless show in an

14       interview (Exhibit D) conducted by CNBC's Jim Cramer, the CEO's for

15       each of the Defendants are confirmed as agreeing that "anybody who drives

16       a lot of data usage is a friend."

17

18   28. The smoking gun in the conspiracy is the simultaneous choice and collusion

19       by the Defendants to not implement recommended infringement controls,

20       also known as "forward lock" DRM (Digital Rights Management) or similar

21       technologies to prevent unauthorized sharing via their new mobile

22       multimedia file-sharing system. These recommendations were made in 2002

23       – 2004 by standards development organizations (SDOs) and trade

24       associations of which the Defendants are or were members in 2002 to date.

25       The obvious collusion by the Defendants to not implement standard

26       technical measures or the preventative technologies as recommended over

27       eight years ago and to lock out content suppliers from the marketplace of

28       real growth where those same products are shared freely to the financial

benefit of the Defendants is in violation of Title 1 §103 of the Standards Development Organization Advancement Act of 2004 which amended the National Cooperative Research and Production Act of 1993 (15 U.S.C 4301) to say; "(c) The term 'standards development activity' excludes the following activities: "(1) Exchanging information among competitors relating to cost, sales, profitability, prices, marketing, or distribution of any product, process, or service that is not reasonably required for the purpose of developing or promulgating a voluntary consensus standard, or using such standard in conformity assessment activities. "(2) Entering into any agreement or engaging in any other conduct that would allocate a market with a competitor. "(3) Entering into any agreement or conspiracy that would set or restrain prices of any good or service."

29. It is also noteworthy that other members within these same trade organizations such as Nokia[6] followed the recommendations before establishing their own multimedia content distribution system. However, none of the Defendants did so collectively. Under the rules of reason, Plaintiff believes this could not have happened without direct collusion and conspiracy amongst the Defendants. This conspiracy and anticompetitive activity by the Defendants will be further described within this Complaint.

///

///

---

[6] Nokia is the world's leading mobile phone supplier and also has its own multimedia content distribution system. Source http://nokia.com

1

2

## C. The Defendants' Conspiracy

3   30. Excerpted from a Motorola[7] (handset providers to the Defendants) 2007

4   document for developers entitled "Introduction of Basic Concepts in OMA

5   DRM v1.0" attached here as (Exhibit E);  pg 4, "Mobile phone users

6   download ring tones, wallpaper, music, movies and games from service

7   providers everyday.  Content downloading is a huge part of the mobile

8   business.  DRM (Digital Rights Management) prevents the illegal

9   distribution of content and protects the interests of the content owner."  The

10   document goes on to describe the importance of providing controls over

11   infringing activities via mobile multimedia file-sharing aka MMS.  The

12   document examples Apple iTunes DRM, Windows Mobile DRM, OMA

13   DRM and other private party DRM techniques and products some of which

14   have existed since before 2002.  It goes on to say that "a lot of handheld

15   devices support OMA 1.0 including almost all 3G terminals."  Excerpted

16   from the same document; pg 9, Conclusion – "DRM protects the value chain

17   of content download and other value added services.  With DRM, the content

18   owner can be properly paid and encouraged to make more valuable content.

19   Motorola supports OMA DRM 1.0 in most handsets and will support OMA

20   DRM 2.0 in the near future."  The Defendants collectively ignored these

21   observations from Motorola as they continued to deploy, develop and

22   promote their new multimedia file-sharing system to the public.

23

24

25

26   [7] Motorola is a provider of analog and digital two-way voice and data radio products and

27   systems for conventional, shared and private applications worldwide.  Source http://motorola.com

28

31. As early as 2002 the Open Mobile Alliance[8] (OMA) an organization that qualifies as an SDO, made their DRM 1.0 (Exhibit F) available to handset manufacturers and wireless carriers. DRM 1.0 provides a feature called "forward lock" that prevents users from forwarding content meant for one time delivery and publication to their handsets from being forwarded to others illegally. DRM 1.0 is primarily a hardware feature that does not require special considerations from the Defendants' infrastructure. However, a simple mandate to handsets bearing the Defendants' names to provide DRM 1.0 or its equivalents would have sufficed for a first step. Collectively not a single provider of MMS services did so. Code needed for wrap around or separate delivery with content created from a user's phone sent to another is a second step in preventing illegal and infringing activities via MMS. Collectively not a single provider of MMS services mandated this to their phone suppliers. Code needed for wrap around or separate delivery with content created by commercial mobile multimedia providers was neither supplied nor mandated by any provider of MMS services to any commercial multimedia content provider. The fact that Defendants and each of them managed to collectively take no action at the same time to prevent illegal file-sharing via MMS although the DRM technology was and is readily available through the OMA of which the Defendants are members defies the rules of reason as upheld by the United States Department of Justice. Plaintiff believes the only possible way these simultaneous conclusions on the part of the Defendants to look the other way for over nine years as their new technology induces and contributes to the direct infringements of others' content for their own financial benefit was by direct

---

[8] The Open Mobile Alliance is an Industry forum for developing market driven, interoperable mobile service enablers. Source http://openmobilealliance.org

communication with each other.  The Defendants and each of them is well aware that by implementing any impedance to the free sharing of content via their MMS services, it would also cause severe impedance to their profits gained from vicariously transporting, distributing and publishing others' content.  Thus, the conspiracy.

32. Excerpted from the wireless carriers' premier trade association's (the CTIA[9]) 2004 document to its members which includes the Defendants and is entitled "Inter-Carrier MMS Messaging Guidelines", attached here as (Exhibit G); pg. 21, 13 Digital Rights Management (DRM) – "All participating carriers agree to support DRM.  On a forward-going basis, the responsibility of maintaining the integrity of the content (DRM) will be on the originating carrier's network (this includes the devices as well).  This applies to DRM as specified in the MMS standard (TS23.140).  It is agreed that if the originating carrier is effective in managing the digital content, then the sender will not be able to send the protected content."  This critical insight provided by one of the Defendants' premier trade organizations (the CTIA) was simultaneously, collectively ignored by the Defendants for over seven years while others belonging to the same organization and having a part in multimedia distribution systems did indeed implement this recommendation to provide standard technical measures to protect copyrighted MMS works.  In fact, it has been over seven years since this recommendation by the CTIA and not one single wireless carrier providing MMS services to the public has

---

[9] The CTIA aka The Wireless Association represents its members with policy makers in the Executive Branch, in the Federal Communications Commission and in Congress.  Source http://ctia.org

1   implemented these basic measures to protect copyrighted works.  Thus the

2   conspiracy.

3

4   **C. Horizontal Division of the Market – Motivation for Conspiracy**

5

6   33. Plaintiff will show the Defendants are conspiring to control and prosper from

7       the multimedia file-sharing (MMS) of others' content in the same way the

8       telecommunications sector became the new controllers of others' content via

9       the Internet.  While the DMCA provides safe harbor to service providers as

10      defined within the DMCA, in the case of MMS, the Defendants do not

11      qualify for such safe harbor.  The Defendants have collectively created and

12      deployed a sub-system of mobile networks that is dedicated to providing end

13      users a way to share copyrighted materials in a way that bypasses any need

14      to pay the original content providers while generating billions of dollars in

15      MMS data revenue to the Defendants.  There is a degree of certainty that the

16      legislative intent behind the DMCA Title 17 §512 et seq. was not to enable

17      the powerful telecommunications industry to get away with the same

18      vicarious copyright infringements for which file-sharing services like

19      Napster[10], Grokster[11], Limewire[12] and others have been shut down.  It is also

20      noteworthy that without the content of others, the Defendants would not

21      generate any MMS data revenue via their new sub-system of multimedia

22      file-sharing.  Thus the conspiracy is to lock out content creators and

23      providers from sharing in the massive MMS data revenue generated from

24

25      [10] *A&M Records, Inc. v. Napster, Inc.* 239 F.3d 1004 (9th Cir. 2001)

26      [11] *Metro-Goldwyn-Meyer Studios v. Grokster, Ltd* 545 U.S. 913, 125 S. Ct. 2764, 162 L.
        Ed 2d 781 (2005)

27      [12] *Arista Records LLC v. Lime Group LLC*  06 CV 5936 (2010)

28

1    these file-sharing activities.

2

3    34. Ironically, Defendants have successfully enticed multimedia content

4        providers of many types to subscribe (Plaintiff did not subscribe) to their

5        collective system of content aggregation via the Common Short Code[13]

6        ("CSC") system or as on deck (via Defendant's servers) content providers

7        whereas Defendants derive an average of 50% of paid content gross revenue

8        due the content providers. Defendants allow this same content of which they

9        have already taken 50% of revenue due the content providers to then be

10       freely shared on their new MMS service of multimedia file-sharing which

11       has generated tens of billions of dollars in data revenue to the Defendants

12       since deployment in 2002. Defendants pay content providers nothing from

13       these MMS file-sharing activities which amount to approximately thousands

14       of times more revenue per item than that which was generated for each paid

15       content item. This scenario effectively undermines the entire future

16       marketplace for selling multimedia content to consumers. This scenario also

17       effectively places the Defendants exactly where they intended to be within

18       the top half of the horizontally divided market while the actual content

19       creators and providers are locked out and within the bottom half of the

20       horizontally divided market. Thus one conspiracy is to collectively not

21       implement any DRM system that would negatively affect the Defendants'

22       intended outcome.

23

24   ///

25   ///

26   ——————————————————

27   [13] CSCA Common Short Codes, by NeuStar and CTIA, focuses on SMS text message
     marketing and mobile advertising via common short codes. Source http://usshortcodes.com

28

## D. The Horizontal Agreement - Price Fixing

35. The Defendants via various telecommunications industry trade associations endeavor to set standards and measurements for the good of their industry and consumers as a whole. In or around 2000, the Defendants through these various trade associations began to pave the way for the Defendants to become the new and dominant way for multimedia content distribution of the future. An important part of the Defendants' strategy is to set in place industry best practices that will serve the good of their industry and consumers as a whole. In utilizing the Common Short Code system and network of authorized aggregators, the Defendants effectively paved the way for dividing the new market amongst themselves. Pricing for multimedia content delivery through these new CSC systems that is charged to content providers by the Defendants is different at each carrier. Furthermore, the cost to content providers is established on a sliding scale based upon the volume of transactions and this sliding scale is also different at each carrier. The Defendants' program for "on deck" content providers is similar as it also provides for variations on price to content providers on a case by case basis. The Defendants appear to be in compliance with antitrust laws in the aforementioned scenario.

36. However, the Defendants having drawn the line dividing a content provider's method of doing business with Defendants and financial benefits thereof, the Defendants collectively set the price paid for use of that content on the topside of that line at zero. Despite the Plaintiff's efforts there is no exception where the Defendants have set a positive price for MMS data revenue sharing for a multimedia content creator or provider. The price is

fixed at zero. The Defendants are well aware that not paid for peer to peer multimedia file-sharing transactions on the Internet far out number actual sales of the same content. The Defendants are banking on that well known phenomenon to happen with MMS. Thus the conspiracy.

37. Plaintiff will show the Defendants have easy access to one another via SDOs, trade associations and other plentiful means of direct communication. At minimum it would be an unreasonable and improbable conclusion that the same market allocation, market division, exclusions of DRM and price fixings common to the Defendants happened by chance and at the very same times.

## E. Negative Effects of the Conspiracy - The U.S. Copyright System
## The Internet Peer to Peer Problem is Amplified Via MMS

38. Public use of the Internet and new technologies brought forth vast opportunities for mankind to become better informed about the world we live in. Access to information and technology that greatly affect our quality of life was suddenly granted as if a switch had been turned on. While progress of this magnitude is welcomed by most, some technologies proved to be devastatingly disruptive to some business models that have been around for decades or even a hundred years.

39. Copyright industries is one of the major casualties of these disruptions because the basic reasoning behind intellectual property rights is in conflict with the Internet and technologies that enable the public to access, copy and publish others' intellectual property at will.

40. The telecommunications sector as the backbone of the Internet suddenly became the new top level gatekeepers of others' intellectual property. Whereas the newspaper business, the music industry, the movie industry, the photography industry and others similarly situated were scrambling to protect their intellectual property rights and assets within these new scenarios, the telecommunications sector began to thrive as the result of suddenly becoming the new top level gatekeepers of everybody's content.

41. Plaintiff will show the Defendants are attempting to repeat these events on mobile networks via their new peer to peer file-sharing technologies (MMS). The disruption to copyright industries may be far greater (there are over 4 billion mobile phone users with MMS capable devices) than the disruptions witnessed via the Internet. As the Defendants develop their systems to transport richer multimedia they again enable the public to access, copy and publish others' intellectual property at will while the Defendants benefit financially.

42. Plaintiff believes that if the Defendants' bold conspiracy is allowed to continue unchecked, the aftermath will certainly escalate the undermining of the U.S. Copyright system.

## F. Negative Effects of the Conspiracy – The Public Turning More Than 4 Billion People Into Potential Infringers

43. Plaintiff believes that peer to peer file sharing via the Internet has basically become the will of the people despite industry and government efforts to curtail unauthorized file-sharing and breaches of security as a by product. Peer to peer file-sharing is a cousin of freedom of speech excepting that the

1    sharing of copyrighted materials without authorization is unlawful.

2

3    44. Condemning peer to peer file-sharing is a lot like condemning freedom of

4        speech. The problem is not the people sharing, it is the vehicle from which

5        they are sharing that is the problem. The vehicle (the Internet) with which

6        they are sharing was flawed from the onset because there were no provisions

7        at the top levels to compensate for unfettered access, unfettered copying,

8        unfettered publications and the unfettered infringement of copyrighted

9        materials.

10

11   45. Plaintiff believes that giving the public the ability to perform the

12       aforementioned activities and then trying to take it away from the public will

13       prove to be a monumental task.

14

15   46. Plaintiff will show that the telecommunications sector is in the best position

16       to fix this problem. The Defendants through their MMS conspiracy will

17       only cause further damage to the public by leading them to further infringe

18       upon others' intellectual property. The public will then bear the brunt of

19       efforts to curtail the infringements and other illegal activities such as child

20       pornography while the Defendants which have enabled this technology and

21       who also have the ability to control these activities may escape liability as

22       others in their sector did via the Internet. The Defendants have clearly only

23       focused on the profits from their new MMS technology with little regard to

24       the negative affects to the community at large.

25

26   47. MMS is a public form of peer to peer file-sharing just like Grokster and

27       Limewire were peer to peer file-sharing systems. The MMS method of file-

28       sharing enables people to push copyrighted multimedia to multiple mobile

devices with one send.  The Grokster and Limewire method of file-sharing enabled people to pull the copyrighted materials from multiple sources to their computer.

48. Plaintiff will prove that any content can be converted to an MMS version to be shared peer to peer via the Defendants' new system.  MMS is not the Internet.

49. If the Defendants' bold conspiracy is allowed to continue unchecked, the temptation to over 4 billion users with MMS capable devices to infringe will become a public disaster way beyond what happened via the Internet.

## G. Negative Effects of the Conspiracy – Unfair Competition
## The Slow Destruction of the Recording Industry

50. Plaintiff will prove the Defendants have placed themselves in position to become the dominant vehicle for multimedia content distribution.  They have invested heavily in building infrastructure that will pave the way to future growth and profitability.  This would not be a problem had they not usurped the power from other existing industries to do so or had they integrated some system of profit sharing for rights holders.

51. One result of the Defendants' enabling of their end users to freely share recorded content owned by others is the undermining of the ability for content providers to profit from selling their physical content anywhere else. By excluding content providers from the new process of sharing in the MMS data revenue generated by their content the Defendants are essentially removing the incentive to invest in or create new physical or digital product

1    as Motorola suggested four years ago to the Defendants.  Thus, further

2    revealing the Defendants' actions as highly anticompetitive.

3

4    52. Plaintiff will show that by excluding content providers from the process of

5    sharing in the MMS data revenue generated by the providers' content the

6    Defendants are essentially starving off revenue generated to content

7    providers until eventually there will be little purpose for creating content as a

8    business and many content providers will not survive because of this.  Thus,

9    the unfair competition.

10

11   53. Plaintiff can prove that if the Defendants included content providers in the

12   process of MMS data revenue sharing they would essentially be neutralizing

13   the negative affects of peer to peer file-sharing via MMS and in fact be

14   monetizing peer to peer file-sharing activities that would more than

15   compensate for the loss of older business models by providing opportunities

16   for growth to all concerned.

17

18   54. Plaintiff believes that if the Defendants' bold conspiracy is allowed to

19   continue they will have successfully divided and allocated the new

20   marketplace for monetizing content amongst themselves resulting in the

21   slow death of commercial content providers along the way.  As that slow

22   death to commercial content providers happens, the Defendants will be

23   insulated and thriving because copyright protected user generated MMS will

24   still fuel their multimedia file-sharing exploitation.  This is a classic case of

25   unfair competition and restraint of trade.

26

27   ///

28   ///

## H. Negative Effects of the Conspiracy – The U.S. Economy
## All Copyright Industries Will Be Affected

55. With copyright industries accounting for approximately 8 – 10% of the U.S. economy, the negative ramifications for allowing the U.S. Copyright system to be further undermined by new technologies will be devastating to the U.S. economy.

56. If the Defendants' bold conspiracy is allowed to continue unchecked, the people of the U.S. will be the biggest losers for we the people will be further divided in our perspectives on copyright laws and we the people will become unwitting vehicles for infringing and unlawful activities.  As a result of these massive unlawful activities whittling away the integrity of the U.S. Copyright system we will undoubtedly see a breakdown of related copyright industries.

## Conclusion

57. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices" and the Supreme Court has said that all violations of the Sherman Act also violate the FTC Act.

58. Plaintiff will show that the Defendants' new MMS technologies can thrive right alongside copyright laws with minimal impact to the Defendants' infrastructure thereby eliminating any need for any conspiracy to divide and allocate the market amongst the Defendants (and other wireless carriers).

59.  Plaintiff is acting now to end the Defendants' MMS conspiracies that are devastating Plaintiff's ability to profit from providing multimedia content and also to prevent the aforementioned negative affects happening to others similarly situated.

## FIRST CLAIM FOR RELIEF – COUNT I

### Conspiracy in Restraint of Commerce

**Violation of Section 1 of the Sherman Act**

60.  Plaintiff incorporates the allegations of paragraphs 1 through 59 by reference as if set forth in their entirety.

61.  Defendants have engaged in a contract, combination or conspiracy with the purpose, intent and effect of restraining commerce with respect to Plaintiff's ability to conduct business.

62.  Defendants have used their oligopoly to exclude Plaintiff from participating in the multimedia market of growth while enabling their customers to share Plaintiff's content at will within that same market for the Defendants' financial benefit only.  The Defendants have unlawfully agreed to operate these MMS file-sharing systems without standard measures of protection for copyrighted works which are also known as assets by Plaintiff and others.

63.  Defendants' unlawful agreements are conspiracies in violation of Section 1 of the Sherman Act.  As set forth above, Plaintiff will continue to suffer antitrust injury and threatened loss or damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## SECOND CLAIM FOR RELIEF – COUNT II

### Horizontal Restraint of Trade

#### Violation of Section 1 of the Sherman Act

64. Plaintiff incorporates the allegations of paragraphs 1 through 63 by reference as if set forth in their entirety.

65. Defendants have engaged in a contract, combination or conspiracy with the purpose, intent and effect of horizontally dividing a market whereas the Defendants are on the top half of that division and Plaintiff and others similarly situated are on the bottom half of that division.

66. The foregoing conduct has placed Plaintiff's business models in serious jeopardy via the theory of supply and demand, whereas a buyer's demand for Plaintiff's MMS and others' multimedia products within the bottom half of the Defendants' horizontally divided marketplace is diminishing as buyers find that same MMS product available free within the top half of the Defendants' horizontally divided marketplace because Defendants purposely refuse to protect the MMS supply although they have had those capabilities for over eight years.

67. Defendants' unlawful agreements for market allocation are conspiracies amongst competitors for restraint of trade in violation of Section 1 of the Sherman Act. As set forth above, Plaintiff will continue to suffer antitrust injury and threatened loss or damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

///

# THIRD CLAIM FOR RELIEF – COUNT III

## Horizontal Price Fixing

### Violation of Section 1 of the Sherman Act

68. Plaintiff incorporates the allegations of paragraphs 1 through 67 by reference as if set forth in their entirety.

69. Defendants have and are engaging in horizontal price fixing whereas deals made with content providers below the Defendants' horizontal line require content providers such as the Plaintiff to share an average of 50% of gross revenues earned with the Defendants; however the price the Defendants' set for use of that same content providers' content above the Defendants' horizontal line has been fixed as zero with no exception.

70. Defendants are in compliance with antitrust price fixing laws below their horizontal line because each carrier has a different sliding scale for payments to the content providers via their Common Short Code system or via a direct deal with their "on deck" content providers.

71. Defendants are not in compliance with antitrust price fixing laws above their line because the Defendants have agreed with no exceptions to pay content providers zero from MMS data revenue generated from the providers' content being shared on their MMS file-sharing systems above the line. Although Defendants have grossed billions of dollars from the exploitation of multimedia content on their MMS systems, they have never set a positive price to be paid to the multimedia content providers. It has always been fixed at zero by these competitors.

72. Defendants' unlawful price fixing is a conspiracy to restrain trade in violation of Section 1 of the Sherman Act. As set forth above, Plaintiff will continue to suffer antitrust injury and threatened loss or damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

## FOURTH CLAIM FOR RELIEF – COUNT IV

### Unfair Methods of Competition

#### Violations of the Federal Trade Act (Title 15 Section 45)

73. Plaintiff incorporates the allegations of paragraphs 1 through 72 by reference as if set forth in their entirety.

74. Defendants have and are engaging in unfair methods of competition. Defendants have excluded Plaintiff and suppliers of MMS from sharing the MMS data revenue generated from Plaintiff's and suppliers' products.

75. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices" and the Supreme Court has said that all violations of the Sherman Act also violate the FTC Act.

76. Defendants' unfair business practices are conspiracies that restrain trade and are anticompetitive except to the Defendants' oligopoly in violation of Section 1 of the Sherman Act. As set forth above, Plaintiff will continue to suffer antitrust injury and threatened loss or damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

///

# FIFTH CLAIM FOR RELIEF – COUNT V

## Collusion Out of Scope From Standard Development Activities

### Violations of the Standards Development Organization Advancement Act of 2004

### Title 15 U.S.C §4301

77. Plaintiff incorporates the allegations of paragraphs 1 through 76 by reference as if set forth in their entirety.

78. The Standards Development Organization Advancement Act of 2004 prohibits collusion amongst competitors: "(1) Exchanging information among competitors relating to cost, sales, profitability, prices, marketing, or distribution of any product, process, or service that is not reasonably required for the purpose of developing or promulgating a voluntary consensus standard, or using such standard in conformity assessment activities. "(2) Entering into any agreement or engaging in any other conduct that would allocate a market with a competitor. "(3) Entering into any agreement or conspiracy that would set or restrain prices of any good or service."

79. At least one consensus to implement DRM for MMS systems was reached by an SDO that Defendants are members of between 2002 through current times. Yet the Defendants and every single U.S. wireless carrier offering MMS services to the public did not implement any DRM or other standard technical measures for the protection of copyrighted works.

80. The rules of reason being applied, it is highly unlikely the Defendants did not exchange information outside of standard development activities that caused every single one of the wireless carriers to make the same horizontal

division of the market, market allocation and horizontal price fixing at the same time, over the same periods of time and continuing to date.

81. This violation of Title 15 § 4301 effectively removes any leniencies the Defendants may have qualified for via the Standards Development Organization Advancement Act of 2004.

## **SIXTH CLAIM FOR RELIEF – COUNT VI**

### **(Unfair Competition – Violation of B&P Code 17200 Against All Defendants)**

82. Plaintiff incorporates the allegations of paragraphs 1 through 81 by reference as if set forth in their entirety.

83. By engaging in the above-described practices and actions, Defendants committed one or more acts of unfair competition within the meaning of California Business and Professions Code §§ 17200 et seq. As used in this Complaint, and in B&P Code § 17200, "unfair competition" means (1) an unlawful, unfair or fraudulent business act or practice. This conduct as alleged is actionable pursuant to B&P Code §§ 17200 and 17203.

84. Beginning in or about January 2007 and continuing thereafter, Defendants have engaged in, and continue to engage in, such unfair competition. Defendants' acts and practices are wrongful, unethical, oppressive, and have caused substantial harm and injury to Plaintiff.

85. Defendants' acts of unfair competition are described herein and include, without limitation, Defendants' conspiracy, restraint of trade and unjust enrichment.

86. Plaintiff has suffered injury in fact and has lost sales revenue, profits, market share, business value and good will as a result of Defendants' unlawful actions and practices in violation of <u>B&P Code</u> §§ 17200 *et seq*

87. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff is entitled to restitution and disgorgement of profits from Defendants in an amount according to proof at trial.

88. Defendants will continue to engage in such unlawful acts, unless and until restrained and enjoined by this Court.  Plaintiff's remedy at law is not by itself adequate to compensate it for the harm that has been and will be inflicted by Defendants.  Plaintiff is therefore entitled to preliminary and permanent injunctive relief restraining Defendants, their officers, directors, members, agents and employees, and all persons acting in concert with them, from engaging in any further acts in violation of California <u>Business and Professions Code</u> §17200.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays for judgment as follows:

1.   Pursuant to 18 U.S.C. §1964(c), Plaintiff demands that judgment be entered in its favor for each Claim and Count I through III against all Defendants jointly and severally for compensatory damages, treble damages, punitive damages, interest, costs and such other relief as the court shall deem appropriate;

2.   For judgment against Defendants in the sum of at least $185,000.00 in compensatory damages according to proof at trial;

3.   For interest at the legal rate on all damages from the date said damages

1    are found to be owing;

2    4.    For punitive and exemplary damages against Defendants according to

3          proof at trial;

4    5.    For imposition of a constructive trust on the profits Defendants

5          received from their illegal and improper acts;

6    6.    For disgorgement of profits received by Defendants through their acts;

7    7.    For costs of suit incurred herein; and

8    8.    For such further relief as the Court deems just, proper, and equitable.

9

10

11                        **DEMAND FOR JURY TRIAL**

12   Plaintiff hereby demands a trial by jury.

13

14

15   DATED: March 27, 2011

16                              Respectfully submitted,

17

18   By: _____

19          Bruce "Max" Davis
            Plaintiff in Pro Se
20

21

22

23

24

25

26

27

28

Ex. A

Received & Inspected

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.**

OCT 22 2008

FCC Mail Room

**October 15, 2008**

**Ms Dortch,**

Thanks for your help. I have enclosed an extra copy of the petition and a self addressed stamped envelope for the return copy as discussed.

Regards,

**Max Davis**
datarevenue.org
22647 Ventura Blvd
Woodland Hills, CA 91367
(818) 713-1510
(818) 312-6338 mobile1

Bill Cation - Secratary

202 - 418 - 0300
Marlene Dortch

WTB - 202 - 418 0600
Jim Schlichting - Bureny Chief
Jane Jackson - Associate Bureau Chief
Jane. Jackson @ FCC .gov

1

Before the
**Federal Communications Commission**
Washington, D.C.

---

In the Matter of:                                                      )
                                                                       )
Data revenue sharing for mobile content providers, publishers  and other    ) Docket No.
rights holders, due to wireless carriers charging customers for multi-media ) ————
data usage and the false assumption that all mobile content providers will  )
be an "on deck" provider with a carrier.                                )

---

## PETITION to the COMMISSION FOR RULEMAKING PROCEEDINGS

### Data revenue will soon exceed voice revenue to wireless carriers

There is an urgent need to address some issues of multi-media data usage over the United
States' and world's wireless networks. It is predicted by wireless industry analysts' that
data revenues will eventually exceed voice revenues to wireless carriers. With that in
mind, currently wireless carriers are promoting forms of data usage which include sms,
(text messaging) and mms, (multi-media messaging). This petition is focused on **multi-media messaging** as this is the form of data usage that entails usage of mobile content
that may or may NOT be controlled by wireless carriers.

### The industry has not addressed copyright issues as it applies to this new technology

With all due respect to the wireless industry, mms is very new. Their attempts to regulate
on behalf of our consumers' privacy issues are noble. However, the industry has failed to
recognize some copyright issues as they may apply to this new technology. The reason
for that failure to recognize is due to non-existent copyright laws that deal with those
issues. Therefore, in the name of DataRevenue.org a currently forming non-profit
professional association that will represent member mobile content producers, publishers
and other rights holders independently of wireless carriers, this PETITION FOR
RULEMAKING to address the issue of data revenue sharing is hereby submitted for the
FDERAL COMMUNICATION COMMISSIONS' determinations.

### Wireless carriers have the ability to track consumer usage

Currently, wireless carriers have the ability to track consumer usage of data and charge
fees according to the amount of usage. The fees charged vary amongst carriers, but
basically, a per megabyte charge is a general guideline for multi-media usage. Metadata
is typically the identifier for data usage. Metadata is typically a binary notation specific
to that data that enables the independent tracking and storage of that data. Therefore, it is
established that the wireless industry **already** has the ability to do the above.

<u>A per megabyte royalty should be established to compensate content producers and publishers</u>

*(1) we move that the wireless industry be mandated by the FEDERAL COMMUNICATIONS COMMISSION to save that data in a secure manner and allow authorized 3rd parties access to that data for purposes of auditing and data revenue sharing, (2) we move that a per megabyte royalty be established by the COPYRIGHT ROYALTY BOARD and administrated by a 3rd party authorized on behalf of it's members to audit, collect and distribute revenues due within the data revenue sharing agreement.*

## BACKGROUND

The growth potential of the music business has been dismal with the advent of the digital age. The music industry's failure to recognize the value of digital innovations early on has caused its own down fall. Even with the salvaged opportunities of ringtones, ringbacks and other new mediums, the music business is still at the mercy of the wireless carriers and therefore can only hope for limited growth if any growth at all.

*There is a new breed of producers and publishers that are creating mobile content optimized to go from a consumer directly to other consumers, (mobile2mobile).*

Normally, a content provider or owner would not like their content to be shared from consumer to consumer. It would seem that it would promote copyright infringement as the content was paid for by the originator and no one else that received it.

*However, under the circumstances we present to you today, if a content provider, publisher or rights holder was to share in the data revenue generated by their content being sent from one place to another, that new breed of producers and publishers will have incentive and the growth potential of the music industry will also be restored.*

The wireless industry already has the ability to do these things, including abundant resources. Why should they be allowed to benefit from mobile content they do NOT own or control without sharing a fair share of the pie?

## CONCLUSION

For the foregoing reasons, DataRevenue.org respectfully requests that the FEDERAL COMMUNICATIONS COMMISSION (1) commence a rulemaking pursuant to C.F.R Title 47 § 1.1 to address data revenue sharing for mobile content providers, publishers and other rights holders, due to wireless carriers charging customers for multi-media data usage and the false assumption that all mobile content providers will be an "on deck" provider with a carrier. (1) we move that the wireless industry be mandated to save data in a secure manner and allow authorized

3rd parties access to that data for purposes of auditing and data revenue sharing, (2) we move that a per megabyte royalty be established by the COPYRIGHT ROYALTY BOARD and administrated by a 3rd party authorized on behalf of it's members to audit, collect and distribute revenues due within the data revenue sharing agreement.

We strongly feel that in addressing these issues now instead of later, The Federal Communications Commission and its Boards will be avoiding the pitfalls the music business has experienced thus far by moving too late.

We also strongly feel that in addressing these issues now instead of later, The Federal Communications Commission and its Boards will be heralding in a new era of growth for content providers and publishers of all types.

**NOTE: A simultaneous filing has been submitted to the COPYRIGHT ROYALTY BOARD as some issues such as establishing a royalty rate may be in the Library of Congress' realm.**

### RELATIVE LINKS
### (Some links may have expired)

http://en.wikipedia.org/wiki/Multimedia_Messaging_Service

http://www.eweek.com/c/a/Mobile-and-Wireless/INSIDE-WIRELESS-CTIA-WIRELESSWireless-Data-is-Finally-Big-Business/

http://hbswk.hbs.edu/item/5791.html

http://www.hbs.edu/research/pdf/08-017.pdf

http://www.fiercemobilecontent.com/story/report-data-exceeds-30-of-revs-for-some-carriers/2008-05-19

http://www.fiercemobilecontent.com/story/how-much-higher-can-data-revenues-go/2008-05-13

Signed: _____

Dated: _____OCT. 14, 2008_____

"Max" Bruce Davis, Founder
DataRevenue.org
22647 Ventura Blvd
Woodland Hills, CA  91364
(818) 713-1510
(818) 312-6338 mobile

Email: max@datarevenue.org



Federal Communications Commission
Washington, D.C. 20554

November 23, 2009

Mr. "Max" Bruce Davis, Founder
DataRevenue.org
22647 Ventura Blvd
Woodland Hills, CA 91364

Dear Mr. Davis,

This letter refers to the petition for rulemaking that you filed on behalf of DataRevenue.org on October 14, 2008, asking the Commission to mandate that wireless carriers save the data regarding their subscribers' usage of multi-media messaging (MMS) and allow authorized third parties, including mobile content providers, publishers, and other content rights holders to gain access to that usage data for purposes of auditing and MMS revenue sharing.[1]  The Petition also asks "a per megabyte royalty be established by the Copyright Royalty Board and administered by a third party authorized on behalf of its members to audit, collect, and distribute revenues due within the data revenue sharing agreement."[2]  The Petition states that "[a] simultaneous filing has been submitted" to the Copyright Royalty Board.[3]  As discussed below, we dismiss the Petition without prejudice as premature and for failure to comply with the Commission's procedural and formatting requirements for pleadings.

The Commission's rules provide that petitions for rulemaking "which are moot, premature, repetitive, frivolous, or which plainly do not warrant consideration by the Commission may be denied or dismissed without prejudice to the petitioner."[4]  We find that the petition is subject to dismissal under this rule for being premature.  The petition asks the Commission to establish carrier obligations to save MMS usage data in order to facilitate enforcement of data revenue sharing rights under copyright law.  The petition also acknowledges, however, that there currently is no copyright law that deals with this issue,[5] and that the establishment of such an obligation under copyright law is outside of the Commission's jurisdiction.[6]  It therefore asks the Copyright Royalty Board (CRB) of the Library of Congress to establish a multi-media data revenue sharing obligation.[7]  There is therefore nothing in the petition to indicate that such obligations have been established.

---

[1] Petition for Rulemaking of DataRevenue.org., filed Oct.14, 2008 ("Petition").

[2] Petition at 2-3.

[3] Petition at 3.

[4] 47 C.F.R. §1.401(e).

[5] See Petition at 1.

[6] Id. at 3.

[7] Petition at 1-3.

Rather, we understand from your website you were informed by the Chief Judge of the Copyright Royalty Board that there was not an existing statute that would enable the Copyright Royalty Board to act upon your proposal to establish a revenue sharing obligation.[8] Your website also indicates you have started asking Members of Congress to establish a statutory rate for all peer-to-peer multimedia transactions via mobile networks.[9] Until the Congress or the Copyright Royalty Board establishes a data revenue sharing obligation for multi-media usage, any regulatory action by the Commission to facilitate private enforcement of such an obligation would be premature.

In addition, the Petition fails to comply with the procedural requirements under Section 1.401(c) of the Commission's rules. The Commission's rules require that "the petition shall set for the text or substance of the proposed rules, amendment, or rule to be repealed, together with all facts, views, arguments and data deemed to support the action requested, and shall indicate how the interests of petitioner will be affected."[10] We find that the substantive discussion of the petition is so fragmented and insufficient that it fails to meet the requirements of Section 1.401(c). The Petition also fails to comply with procedural requirement under Sections 1.49 and 1.401(b).[11] Failure to comply with these procedural requirements is also ground for dismissal.[12]

Accordingly, pursuant to Sections 1.49, 1.401(b), (c), and (e), and 1.407 of the Commission's rules, the Petition for Rulemaking filed by DataRevenue.org on October 14, 2008, is hereby dismissed without prejudice for its premature status and its failure to comply with the Commission's procedural requirements. This action is taken pursuant to authority delegated by Sections 0.331 of the Commission's rules.

Sincerely,

Ruth Milkman
Chief
Wireless Telecommunications Bureau

---

[8] http://datarevenue.org/datarevenue/OPEN LETTERS.htm.

[9] Id.

[10] 47 C.F.R §1.401(c).

[11] See 47 C.F.R. §§ 1.401, 1.49.

[12] See 47 C.F.R. § 1.407.

OCT 2 1 2008

**Before the**
**COPYRIGHT OFFICE**
**LIBRARY OF CONGRESS**
**Washington, D.C.**

**October 15, 2008**

**Leticia et al,**

**Thanks for your help on the phone.  I have enclosed an extra copy of the petition and a self addressed stamped envelope for the return copy as discussed.**

**Regards,**

**Max Davis**
**datarevenue.org**
**22647 Ventura Blvd**
**Woodland Hills, CA  91367**
**(818) 713-1510**
**(818) 312-6338 mobile1**

**Before the
COPYRIGHT OFFICE
LIBRARY OF CONGRESS
Washington, D.C.**



In the Matter of:                                                      )
                                                                       )
                                                                       ) Docket No.
Data revenue sharing for mobile content providers, publishers  and other  )
rights holders, due to wireless carriers charging customers for multi-media  ) ————
data usage and the false assumption that all mobile content providers will  )
be an "on deck" provider with a carrier.                               )

## PETITION FOR RULEMAKING AND TO CONVENE THE COPYRIGHT ROYALTY BOARD

### Data revenue will soon exceed voice revenue to wireless carriers

There is an urgent need to address some issues of multi-media data usage over the United States' and world's wireless networks.  It is predicted by wireless industry analysts' that data revenues will eventually exceed voice revenues to wireless carriers.  With that in mind, currently wireless carriers are promoting forms of data usage which include sms, (text messaging) and mms, (multi-media messaging).  This petition is focused on **multi-media messaging** as this is the form of data usage that entails usage of mobile content that may or may NOT be controlled by wireless carriers.

### The industry has not addressed copyright issues as it applies to this new technology

With all due respect to the wireless industry, mms is very new.  Their attempts to regulate on behalf of our consumers' privacy issues are noble.  However, the industry has failed to recognize some copyright issues as they may apply to this new technology.  The reason for that failure to recognize is due to non-existent copyright laws that deal with those issues.  Therefore, in the name of DataRevenue.org a currently forming non-profit professional association that will represent member mobile content producers, publishers and other rights holders independently of wireless carriers, this PETITION FOR RULEMAKING to address the issue of data revenue sharing is hereby submitted for the COPYRIGHT ROYALTY BOARD's determinations.

### Wireless carriers have the ability to track consumer usage

Currently, wireless carriers have the ability to track consumer usage of data and charge fees according to the amount of usage.  The fees charged vary amongst carriers, but basically, a per megabyte charge is a general guideline for multi-media usage.  Metadata is typically the identifier for data usage.  Metadata is typically a binary notation specific

to that data that enables the independent tracking and storage of that data. Therefore, it is established that the wireless industry **already** has the ability to do the above.

<u>A per megabyte royalty should be established to compensate content producers and publishers</u>

*(1) we move that the wireless industry be mandated to save that data in a secure manner and allow authorized 3rd parties access to that data for purposes of auditing and data revenue sharing, (2) we move that a per megabyte royalty be established by the COPYRIGHT ROYALTY BOARD and administrated by a 3rd party authorized on behalf of it's members to audit, collect and distribute revenues due within the data revenue sharing agreement.*

## BACKGROUND

The growth potential of the music business has been dismal with the advent of the digital age. The music industry's failure to recognize the value of digital innovations early on has caused it's own down fall. Even with the salvaged opportunities of ringtones, ringbacks and other new mediums, the music business is still at the mercy of the wireless carriers and therefore can only hope for limited growth if any growth at all.

*There is a new breed of producers and publishers that are creating mobile content optimized to go from a consumer directly to other consumers, (mobile2mobile).*

Normally, a content provider or owner would not like their content to be shared from consumer to consumer. It would seem that it would promote copyright infringement as the content was paid for by the originator and no one else that received it.

***However, under the circumstances we present to you today, if a content provider, publisher or rights holder was to share in the data revenue generated by their content being sent from one place to another, that new breed of producers and publishers will have incentive and the growth potential of the music industry will also be restored.***

The wireless industry already has the ability to do these things, including abundant resources. Why should they be allowed to benefit from mobile content they do NOT own or control without sharing a fair share of the pie?

## CONCLUSION

For the foregoing reasons, DataRevenue.org respectfully requests that the Copyright Office (1) commence a rulemaking pursuant to 17 U.S.C. § 702 to address data revenue sharing for mobile content providers, publishers and other rights holders, due to wireless carriers charging customers for multi-media data usage and the false assumption that all mobile content providers will be an "on deck" provider with a carrier. (1) we move that the wireless industry be mandated to save data in a secure manner and allow authorized

3rd parties access to that data for purposes of auditing and data revenue sharing, (2) we move that a per megabyte royalty be established by the COPYRIGHT ROYALTY BOARD and administrated by a 3rd party authorized on behalf of it's members to audit, collect and distribute revenues due within the data revenue sharing agreement.

We strongly feel that in addressing these issues now instead of later, The Library of Congress and its' Boards will be avoiding the pitfalls the music business has experienced thus far by moving too late.

We also strongly feel that in addressing these issues now instead of later, The Library of Congress and its' Boards will be heralding in a new era of growth for content providers and publishers of all types.

**NOTE:  A simultaneous filing has been submitted to the FCC as some issues such as mandating the secure storage and providing access to the data may be in the FCC's realm.**

### RELATIVE LINKS
(Some links may have expired)

http://en.wikipedia.org/wiki/Multimedia_Messaging_Service

http://www.eweek.com/c/a/Mobile-and-Wireless/INSIDE-WIRELESS-CTIA-WIRELESSWireless-Data-is-Finally-Big-Business/

http://hbswk.hbs.edu/item/5791.html

http://www.hbs.edu/research/pdf/08-017.pdf

http://www.fiercemobilecontent.com/story/report-data-exceeds-30-of-revs-for-some-carriers/2008-05-19

http://www.fiercemobilecontent.com/story/how-much-higher-can-data-revenues-go/2008-05-13

Signed: _____

Dated: _____ Oct. 14, 2008 _____

"Max" Bruce Davis, Founder
DataRevenue.org
22647 Ventura Blvd
Woodland Hills, CA  91364
(818) 713-1510
(818) 312-6338 mobile

Email: max@datarevenue.org

3

 **United States Copyright Royalty Judges**

Mr. Bruce Davis
DataRevenue.org
22647 Ventura Blvd.
Woodland Hills, CA 91364

October 22, 2008

Dear Mr. Davis:

Your petition for rulemaking and to convene the Copyright Royalty Board was received today. In order to consider what we should do with this document, you should provide the statutory license and the authority you believe empowers the Copyright Royalty Judges to take the actions you request.

Sincerely,

James Scott Sledge
Chief Copyright Royalty Judge



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

NOV 1 2 2009

Mr. Max Davis
Director
DataRevenue.Org
22647 Ventura Blvd # 145
Woodland Hills, CA 91364

Dear Mr. Davis:

Thank you for your letter dated August 1, 2009, to Secretary Locke noting the implications to copyright posed by P2P file-sharing, explaining the potential of the Internet to provide new and enhanced revenue streams and proposing "a statutory rate set for the deliverance of copyrighted multimedia via data infrastructures." Your letter has been referred to the United States Patent and Trademark Office (USPTO) for response.

By way of background, the USPTO advises the President and Federal executive branch agencies on matters of copyright law and policy. The protection of intellectual property is a high priority for this administration as we work to ensure that American innovators are adequately and effectively protected both domestically and in foreign markets. Against this background, the USPTO appreciates your interest in responding to the challenges of on-line reproduction and distribution of copyrighted works.

I encourage you to continue to develop and market your ideas and to share and debate them with other relevant copyright stakeholders. With your support and the support of others like you I am certain that we can realize the power and promise of the digital age.

Sincerely,

Lois E. Boland
Director
Office of Intellectual Property Policy
and Enforcement

THE WHITE HOUSE

October 14, 2009

Mr. Max Davis
22647 Ventura Boulevard
Woodland Hills, California  91364-1416

Dear Max:

Thank you for your note and for sharing your views with me.

Active citizens are the cornerstone of our democracy, and so I thank you for engaging in the important work of true citizenship.  Our strength as a country and our ability to responsibly shape our future depends on informed and impassioned Americans.

Our President's views on a variety of issues are available online at www.whitehouse.gov, where you can explore his agenda and stay updated on news from the White House.  I urge you to stay active by sharing your thoughts online or by addressing needs in your community as we confront the challenges of this important moment for our Nation.

Thank you again for writing.  I wish you all the best.

Sincerely,

*Michelle Obama*

Ex. B

# The Effects of the Wireless Carriers' Failure to Implement DRM for MMS



# Have we learned nothing from these lessons?

### Max Davis' Multimedia Developments
### Chronological Report

2002- Developed the "theory of participation and sharing" where artists could share their earnings and bonuses with their supportive public.

2003- The RIAA declined to take this concept to their members citing conflicts of interest with their non-profit status. Max invested $100,000 to develop the code, federal trademarks and everything else to launch "DigiPie".

2004- In July DigiPie was opened to the public and through various alliances offered the products from over 50,000 independent artists. Max invested another $50,000.

2005- Music sales had been steadily declining since the advent of digital copying and Internet file-sharing. A copy was basically no different from an original and it was very easy to find stuff on the Internet from peer to peer file-sharing sites. The music business is a victim of **"supply and demand"** (see charts).

2006- DigiPie continued to attract artists and was offering over a million music downloads from independent artists. Sales were flat. Max invested another $50,000.00

2007- Since sales were flat Max began the exploration of other ways to offer multimedia content. At the same time lots of downloading sites were going out of business (see chart). Max began looking into the possibilities for mobile distribution as ringtones were becoming popular and picture messaging began to include audiovisuals. Max noticed that wireless carriers were becoming distributors of multimedia and earning revenue from people sharing multimedia content on their new distribution networks. Max invested $50,000 to build a production studio, mobile production unit and to train a staff to produce multimedia geared towards mobile phones.

2008- There were severe restrictions to the type of multimedia that could be shared peer to peer, mobile phone to mobile phone in 2007 but Max noticed that threshold was changing everyday. Peer to peer sharing of images (copyrighted materials) was already generating millions of dollars in data revenue to the carriers. Max felt videos and music would soon follow. Max invested $135,000 for the research and development of these types of products. Since sales were flat from offering the artists' content Max stopped offering those products and replaced them with mobile multimedia downloads of many different kinds. DigiPie was now offering MMS downloads to the public. Max continued to develop data products and distribution for the products

however, noticing that "sales" of any type of multimedia were impeded by the **"supply and demand"** dilemma, Max began to notice that the real opportunities for growth was in the sharing. **The wireless carriers were way ahead of Max.** When Max tried to make deals with the carriers for MMS data revenue sharing partnerships they declined and referred him to their content aggregators and Common Short Code system of doing business.

2009- Businesses backed by Max continued to develop data products, new distribution for the products and they became world leaders in the production of MMS content however, sales were flat. Most of the distributors enabled freebies, trial versions or sales as a choice to consumers. By the end of 2009 Max had backed the production of over 3,000 MMS products. Although there were over 150,000 downloads of MMS products backed by Max, total sales in dollar amounts was less than $500.00. Yet the wireless carriers made billions of dollars during that same period from persons sharing multimedia via MMS. Conclusion: MMS is already a victim of **"supply and demand"** because of the wireless carriers handling of multimedia via MMS.

2010- This trend continued throughout 2010.

2011- Max Davis realizes that investing in multimedia of any type is going to be a waste of time and money unless the wireless carriers provide the community at large with a way to share in the data revenue generated from the multimedia content created by that same community.

# The Negative Effects to Music Sales From Copying and File-Sharing



## Have we learned nothing from these lessons?

# The Negative Effects to Music Sales From Copying and File-Sharing (2)

| Recorded Music Sales 2008-2009 % Change by Region | | | | |
|---|---|---|---|---|
| | **Physical** | **Digital** | **Perf. rights** | **Total** |
| North America | -17.9% | 1.1% | 20.3% | -10.4% |
| Europe | -8.9% | 29.7% | 4.1% | -4.1% |
| Asia | -15.4% | 10.4% | 11.9% | -9.2% |
| Australia/New Zealand | -2.4% | 41.4% | 8.6% | 3.5% |
| Latin America & Caribbean | -4.7% | 17.6% | 23.2% | -0.7% |
| **Global** | **-12.7%** | **9.2%** | **7.6%** | **-7.2%** |

**Source:** IFPI

# Have we learned nothing from these lessons?

# The Negative Effects to Music Sales From Copying and File-Sharing (3)



# Have we learned nothing from these lessons?



**DigiPie Knows How to Win Against P2P Without Suing, Will the RIAA Listen?**

Quote: "DigiPie can do for the new digital recording industry what the RIAA did for the previous model, without the negativity. However, we are very close to commercializing DigiPie privately and independent of that previous model. This is ironic as this was not my intention. I would rather see the entire industry run with the DigiPie model and maximize the potential to benefit all concerned. If the RIAA wants to gatekeep and monitor numbers for the recording industry in the digital age, then they should simply sanction or have their own downloading service for all of it's members and stop suing our citizens who are just keeping up with technology."

(PRWEB) September 27, 2004

Two years ago the inventors of DigiPie, (EquityMusic.com at that time), approached the RIAA with the hopes of introducing their model and software to RIAA members. While Ms. Rosen's office, (CEO of the RIAA at the time), allowed a demonstration of the model via telephone, (the software was in development), the RIAA chose not to introduce the model to it's members claiming neutrality in potentially profitable matters. What they failed to understand is the model and software was specifically designed for the recording industry as a whole. Any label can participate bringing their entire roster in part or in full. Any artist can do the same. The model is based upon a large volume of material being released for public consumption.

The huge advantage to the recording industry is the software automates most functions of a recording company and it makes new talent readily available for them to filter instead of having to ignore the majority of talent because of financial restraints. The future is going to be faster turnovers in products and artists. The need to "milk" one song/release to death will be a thing of the past, the people are demanding it.

In a rare interview, Max Davis, a co-founder of DigiPie is quoted as saying, "DigiPie can do for the new digital recording industry what the RIAA did for the previous model without the negativity. However, we are very close to commercializing DigiPie privately and independent of that previous model. This is ironic as this was not my intention. I would rather see the entire industry run with the DigiPie model and maximize the potential to benefit all concerned. If the RIAA wants to gatekeep and monitor numbers for the recording industry in the digital age, then they should simply sanction or have their own downloading service for all of it's members and stop suing our citizens who are just keeping up with technology. I am trying to get speaking time at the Billboard Digital Entertainment Conference & Awards to explain our position. Otherwise, our freshly minted business plan for private funding has a January 2005 fruition date." (To view the entire interview contact Glenn Clarke at Brazasia1@yahoo.com).

# # #

**Contact Information**

**Glenn Clarke**

http://DigiPie.com
818 631-1535

**Disclaimer:** If you have any questions regarding information in these press releases please contact the company listed in the press release.
Please do not contact PRWeb®. We will be unable to assist you with your inquiry.
PRWeb® disclaims any content contained in these releases. Our complete disclaimer appears here.

© Copyright 1997-2010, Vocus PRW Holdings, LLC.
Vocus, PRWeb and Publicity Wire are trademarks or registered trademarks of Vocus, Inc. or Vocus PRW Holdings, LLC.

Terms of Service | Privacy Policy

Case 2:11-cv-02674-DDP-RZ Document 1 Filed 03/30/11 Page 53 of 117 Page ID #:53



**DigiPie Announces A Digital Distribution Deal With CD Baby**

DigiPie will be offering digital product from over 70,000 artists as a result of a digital distribution deal with CD Baby.com.

(PRWEB) October 28, 2004

Effective immediately, DigiPie will offer digital content from CD Baby. This represents a major break through as DigiPie transitions from beta launch to mainstream. CD Baby provides access to 300,000 + releases by independents of all genres from all over the world. Max Davis CEO of DigiPie says, "Working with Derek Sivers and Gray Gannaway to bring this about was as smooth a deal as could be. I owe Scott G., (The G-Man), a hearty thank you for paving the way to this deal."

DigiPie will be adding thousands of artists to it's roster because of this and thereafter promoting it's unique services to the general public. CD Baby represents one of the best known and reputable places for artists to promote and sell their tangible products on the internet. With it's completely transparent model, DigiPie intends to become the best known and reputable place for creators of digital media to promote and sell their digital products on the net.

About CD Baby

CD Baby does online sales and distribution for independent artists and

labels. Founder and musician Derek Sivers was selling his own CD online in

1997, and he eventually asked a few friends if they'd like to sell their

CDs there, too. Friends told friends and now over 70,000 artists sell their

music through CD Baby. CD Baby has sold over one million CDs sold to

customers worldwide, and paid over $10 million dollars to musicians. CD

Baby's Digital Distribution program has deals with all major digital

outlets, as well as many new innovative digital retailers. For more

information visit http://www.cdbaby.com.

For more information on CD Baby, see cdbaby.com or contact Alex Steininger

at alex@cdbaby.com or 503-255-2569.

DigiPie is where the creators of digital media are in control. The model and software enables a creator of digital content to promote their products, sell their products and administrate legal and accounting issues associated with selling their products online. This includes generating agreements, registering copyrights electronically and tracking sales and the percentages of all contributors to the project in real time.

The online broadcast features the playing of samples ONLY that have a 5-7 second closing or intro to help Artists move product quickly.

The general public participates in the success of it's favorite Artists by developing equity in each song/media it purchases. By letting the general public have a "slice of the pie" through a patent pending business model and software, DigiPie is setting the stage to be the premier legal downloading service. The model discourages illegal downloading because the "public" actually shares with the artist in every media/song purchase. In fact, the public can even make a "profit" downloading at DigiPie.

For more information on DigiPie, visit digipie.com or call (800) 582-0932

**Runaway Inflation** Here's 3 ways to profit from Inflation and panic. Free Report AgoraFinancial.com/Inflation

**How to Buy Gold** Physical Gold Shipped to Your Door Free Investor Kit. Since 1960. Goldline.com/Buy-Gold

**2 Stocks to Hold Forever** Buy them, forget about them, and never sell them. www.StreetAuthority.com

Ads by Google

Posts | Comments | E-mail / •

Monday, March 28, 2011

Search in site...

EconomicNews Source

Searching for **digipie**?
Best online options for Digipie
Compare our best 10 results for yo...
http://www.happili.com

Chitika | Premium 🔎

- Home
- Business
- Employment
- Finance
- International Business
- International Trade
- Market News
- NAFTA
- News Store
- Politics
- South America
- The Dollar
- The Economist
- The Environment
- The Recession
- The White House
- Top Stories
- U.S. Business
- U.S. Economic Trends
- U.S. Economy
- World Economic Trends
- World Economy

# DigiPie Welcomes WeDVDyou.com and The Adult Fight Club as New Sellers of Digital Media

Posted by admin on Sep 21st, 2010 and filed under Economic Cycles. You can follow any responses to this entry through the RSS 2.0. You can leave a response or trackback to this entry

Woodland Hills, CA (PRWEB) April 30, 2007

Los Angeles, California (PRWEB) April 28, 2007 DigiPie Welcomes weDVDyou.com and The Adult Fight Club as new sellers of digital media. Although Wikipedia removed DigiPie from it's community listings some time ago, the sharing and participation site continues to attract those in the know. Most recently, content developers weDVDyou.com and The Adult Fight Club elected to sell product from DigiPie's control panels.

The controversy at Wikipedia was evidently caused by an interpretation of what is a definition and what is a promotion. Apparently, the definition was received by editors at Wikipedia as self promoting when in fact a statement that "DigiPie is a transaction vehicle that enables sellers of digital media to share income with participating buyers of

goods and services offered", is a fairly straight forward hype free statement according to executives at DigiPie. Max Davis, CEO and Founder of DigiPie said, "When I first found out they had removed us for self-promoting I had to laugh. Here's a supposedly open forum built to inform unbiasedly and yet someone is pompous enough to choose what is being defined and what is being promoted? So how are we supposed to inform others that we do what we do if what we do is not definable? Time will tell."

Independent content developers weDVDyou.com will be selling digital media it produces for it's clients effective immediately. The video clips will retail for $ .99 – .99 per download depending on the clients preference and the category to be sold in.

The independent producers, The Adult FightClub will be selling content effective immediately. JRekk, lead director for The Adult Fight Club will be administrating the control panel.

About DigiPie:

DigiPie is a concept and philosophy of participation and sharing in an economic cycle. Thanks to digital technology even the smallest movement in an economic cycle can be tracked as it affects the whole in "real time". DigiPie records and displays these movements in real time for all participants and concludes a given economic cycle with payouts to all participants based upon their level of participation. DigiPie establishes a virtual bond between buyers and sellers by adding extra value to any economic situation.

###

**The Biggest Day of 2011?**
A wealthy businessman says a single day will soon change the US forever
youtube.com

Ads by **Google**

## Leave a Reply

| Name (required)

| Mail (will not be published) (required)

| Website

reflec ricasted

stop.com
read book.

Advertisement

**Runaway Inflation** Here's 3 ways to profit from Inflation and panic. Free Report AgoraFinancial.com/Inflation

**How to Buy Gold** Physical Gold Shipped to Your Door Free Investor Kit. Since 1960. Goldline.com/Buy-Gold

**2 Stocks to Hold Forever** Buy them, forget about them, and never sell them. www.StreetAuthority.com

Ads by Google

Posts | Comments | E-mail /

Monday, March 28, 2011

Search in site...

EconomicNews Source

Searching for **digipie**?
Best online options for Digipie
Compare our best 10 results for yo...
http://www.happili.com

Chitika | Premium

- Home
- Business
- Employment
- Finance
- International Business
- International Trade
- Market News
- NAFTA
- News Store
- Politics
- South America
- The Dollar
- The Economist
- The Environment
- The Recession
- The White House
- Top Stories
- U.S. Business
- U.S. Economic Trends
- U.S. Economy
- World Economic Trends
- World Economy

# DigiPie Welcomes WeDVDyou.com and The Adult Fight Club as New Sellers of Digital Media

Posted by admin on Sep 21st, 2010 and filed under Economic Cycles. You can follow any responses to this entry through the RSS 2.0. You can leave a response or trackback to this entry

Woodland Hills, CA (PRWEB) April 30, 2007

Los Angeles, California (PRWEB) April 28, 2007 DigiPie Welcomes weDVDyou.com and The Adult Fight Club as new sellers of digital media. Although Wikipedia removed DigiPie from it's community listings some time ago, the sharing and participation site continues to attract those in the know. Most recently, content developers weDVDyou.com and The Adult Fight Club elected to sell product from DigiPie's control panels.

The controversy at Wikipedia was evidently caused by an interpretation of what is a definition and what is a promotion. Apparently, the definition was received by editors at Wikipedia as self promoting when in fact a statement that "DigiPie is a transaction vehicle that enables sellers of digital media to share income with participating buyers of

goods and services offered", is a fairly straight forward hype free statement according to executives at DigiPie. Max Davis, CEO and Founder of DigiPie said, "When I first found out they had removed us for self-promoting I had to laugh. Here's a supposedly open forum built to inform unbiasedly and yet someone is pompous enough to choose what is being defined and what is being promoted? So how are we supposed to inform others that we do what we do if what we do is not definable? Time will tell."

Independent content developers weDVDyou.com will be selling digital media it produces for it's clients effective immediately. The video clips will retail for $ .99 – .99 per download depending on the clients preference and the category to be sold in.

The independent producers, The Adult FightClub will be selling content effective immediately. JRekk, lead director for The Adult Fight Club will be administrating the control panel.

About DigiPie:

DigiPie is a concept and philosophy of participation and sharing in an economic cycle. Thanks to digital technology even the smallest movement in an economic cycle can be tracked as it affects the whole in "real time". DigiPie records and displays these movements in real time for all participants and concludes a given economic cycle with payouts to all participants based upon their level of participation. DigiPie establishes a virtual bond between buyers and sellers by adding extra value to any economic situation.

###

**The Biggest Day of 2011?**
A wealthy businessman says a single day will soon change the US forever
youtube.com

Ads by Google

## Leave a Reply

| | Name (required) |

| | Mail (will not be published) (required) |

| | Website |

reflec riaasted

stop spam
read books

Advertisement

job board      advertise      about      conferences      charts



search

home

**Login**

Username

Password

login

ⓘ forgot your password?

Register to access archived
stories or to receive the Daily
Snapshot email.

**100 Fucked Music Companies...**                                   Flat

presnikoff                                          Friday, November 12, 2010



*(#musicindustry, #music, #startup)* Still want to launch that music
startup?  We spent the morning brainstorming through 100 companies
that died, most of them in the last 5-10 years.  Plus, we threw some
established companies and initiatives into the mix for kicks.  But even
after a full pot of coffee and hours at the table, we're still wondering:
what did we miss?

## 1. Napster (I, that is...)



2. LimeWire

3. Spiralfrog

4. Overpeer

5. Ruckus

6. TotalMusic

7. AllofMP3

8. Amp'd Mobile

9. Imeem

10. MediaDefender

**11.** ⟨ S N O C A P ⟩

12. Muxtape

13. Uplister

14. Mercora (Social.fm)

15. Angry Coffee

16. Aron's Records

17. Spaceland

18. Coolfer

19. Tower Records

**Jobs**

The latest openings. Complete list
**here**.



Web Developer
**MTV Networks**
New York, NY

Roadrunner Content
Editor/Manager
**Warner Music Group**
New York, NY

Director, Production and Retail
Sales/Marketing
**Downtown Records**
New York City

tinyOGRE Entertainment –
Coordinator
New York, NY

Manager, International Digital
Sales & Marketing
**Sony Music Entertainment**
New York, NY

Tour Marketing and Coordinator
Director
**Complete Control Management**
Brooklyn, New York



Manage Your
Band from
Anywhere.

REVERB

**Most Read
Stories**

The 20 Hardest
Working Bands of
2010...

The History of
Recording
Industry Sales,
1973-2010...

Are Music
Consumers
Stepping On Us?

Wow, YouTube
Really Thinks
We're That
Stupid...

Spotify, In
Numbers:
.00000000000....

20. Passalong Networks

## 21. Weedshare



22. Kazaa

23. mp3.com

24. Qtrax

25. iMesh

26. Helio

27. BurnLounge

28. AudioGalaxy

29. WebNoize

30. Cdigix

**31.** seeqpod
Playable Search

32. Clickradio

33. iCast

34. Nareos

35. StreamCast Networks

36. MusicIP (Predixis)

37. Waxie Maxie's

38. CuteMX

39. Blender

40. Radio & Records (R&R)

## 41. SDMI (Standard Digital Music Initiative)

42. Creem

43. RIP (magazine)

44. eDonkey

45. Scour Exchange

46. Odeo

47. Sonific

48. PlaysforSure

49. Reciprocal

50. Kick.com

## 51. Pressplay

52. MediaNet I

53. SkreemR

54. DigiPie

55. Lumberjack Distribution

56. Sony BMG Music Entertainment

57. WorldSpace

58. Musicane

59. MyStrands

60. Xingtone

61. 

62. VoyMusic

63. Musicrypt

64. Liquid Audio

65. Echo

66. Reboot Music

67. Muse.net

68. Radio Free Virgin

69. Zingy

70. 411-Song

71. 

72. Virgin Megastores (North America, Asia)

73. Morpheus

74. Torrent Entertainment Network

75. LiveUniverse

76. P2P United

77. Circuit City

78. Pinnacle Distribution

79. Neuton

80. Songbeat

81. 

82. Fusion Distribution III

83. MusicGiants

84. Millennium Music

85. The Box

86. CBGB's

87. Digital Entertainment Network (DEN)

88. PluggedIn

89. Soundbuzz

90. OOiZiT

## 91. Mulve.com

92. WinMX

93. MediaSentry

94. Topspinner

95. Colombo-BT.org

96. Relatable

97. Cashbox

98. Musicland

99. Sony Cassette Walkman

100. FatBeats

Recommend    83 people recommend this.

Comments Closed  ·  View Comments Flat

**Comment By:** rehaam                                                        Friday, November 12, 2010

I'm assuming you didn't include logos because Limewire (#2!) would sue you for trademark infringement?

**Comment By:** presnikoff                                                     Friday, November 12, 2010

hilarious.

we'll load some pretty pictures in later, I couldn't wait to publish this one.

-pr.

**Comment By:** @JasonBJenkins                                              Friday, November 12, 2010

JasonBJenkins

How many of these have you worked for, with or on?

**Comment By:** charlie                                                         Friday, November 12, 2010

you forgot terra firma

**Comment By:** steven corn                                                     Friday, November 12, 2010

you mentioned Liquid Audio twice and failed to include Burnlounge.

**Comment By:** @herskowitz                                                    Friday, November 12, 2010

Jason Herskowitz

4 (+ MusicNow = 5)

**Comment By:** jt                                                              Friday, November 12, 2010

Where is EMI? I thought that would have made top 10 easily.

Ex. C

**The Association's mission is to establish accountability and fair compensation for multimedia creators on peer2peer mobile messaging systems (MMS).  Please support:**

# datarevenue.org

"It's really very basic - deploying new systems of content distribution for financial gain should also begat new revenue streams for the people that create the content being distributed.  Copyright protection subsists in all multimedia - that's just the way it is"
Max Davis, founder of DataRevenue.Org

**About us**        **Membership**        **Background**        **What is MMS?**        **Contact Us**

Help our members fight in court!

**Multimedia messaging system = MMS - This system was designed and implemented by wireless carriers to enable end users to share multimedia files peer2peer while they profit from these activities.  MMS is a dedicated sub-system of mobile networks that has little to do with the Internet and the providing of other telecommunications.**

- A 'pull' file-sharing system enables end users to share files.  LimeWire is a file sharing system that enables end users to search, find and obtain files being shared by others.  This is an example of a 'pull' file-sharing system because you actually **pulled the file in** from somewhere.

- A 'push' file-sharing system enables end users to share files.  MMS is a file-sharing system that enables end users to send or **push multimedia files** to whomever they choose singularly or in groups.

- It is important to understand that **ANY** content can be converted to an MMS version to be shared peer2peer.  For example, a 30 second ringtone in the popular mp3 format can be converted to an MMS version in under 15 seconds.

**The following diagrams from a "3GPP2" Functional Description document illustrate the fact that an MMS network is a dedicated system for the transport, distribution and publication of MMS content amongst peers *for profit*. However, this dedicated sub-system of mobile networks also uses relay servers for storage as needed.**

........shows the MMS Reference Architecture and identifies reference points within an MMSNA that are further described below. Abstract messages are indicated in section 8 that describe the logical message exchange on these reference points on a high-level basis.

Learn why our members are mad and doing something about it!



Please read - The DataRevenue.Org Doctrine

MMS is ALREADY Larger Than the Music Industry and Movie.........

CTIA Survey Shows 24.3 Billion MMS 2nd Half of 2009





## 6.6    MM4: Interworking of different MMSEs

Reference point MM4 between MMS Relay/Servers belonging to different MMSEs is used to transfer messages between them. Interworking between MMS Relay/Servers shall be based on SMTP according to [22] as depicted in figure 5.



**Figure 5: Interworking of different MMSEs**

Interworking between different MMS service providers is further elaborated in section 8.4.

**And so it appears that not only is MMS similar to LimeWire and other modern day peer2peer file-sharing networks, by actually storing multimedia on servers, multimedia messaging systems are more like the old Napster version of peer2peer file-sharing!**

**A file-sharing system may be "push or pull". In LimeWire's case it is a "pull". MMS is a "push".**

Please read - The
DataRevenue.Org
Doctrine

MMS is ALREADY
Larger Than the Music
Industry and
Movie.........

CTIA Survey Shows
24.3 Billion MMS 2nd
Half of 2009

More than 4 billion
MMS flowed through
Verizon's network in Q4
2009!

Ex. D

Preview Mail w/ Toolbar

**YAHOO!** FINANCE

     $3.95

# @ CTIA: Sparks Fly Over AT&T-T-Mobile Deal As Wireless CEOs Trade Jabs

paidContent.org

Tom Krazit, On Tuesday March 22, 2011, 10:41 am EDT

Just days after AT&T's stunning announcement of its intent to purchase T-Mobile, the men who would lead the three remaining dominant U.S. wireless carriers exchanged barbs Tuesday over the planned purchase and each other's business models. Nothing exceptionally new emerged from the discussion, but the battle lines are clearly being drawn.

The man who has perhaps the most to lose from a combined AT&T (NYSE:T - News) and T-Mobile—Sprint's Dan Hesse—was not shy about hinting where he stood. "My opinion doesn't matter, I think the FCC and the DOJ will have an opinion," he said, in response to questions from CNBC's Jim Cramer during the opening session at the CTIA Wireless show. Earlier in the morning, FCC Chairman Julius Genachowski made it clear before he launched into a speech about a promising wireless future that he was not going to comment on the deal, which was announced Sunday.

AT&T's Ralph De La Vega defended it against criticism from consumer advocates and many wireless industry professionals that the combined AT&T/T-Mobile would stifle competitiveness in the industry and harm consumers, lifting many talking points from AT&T's press release. AT&T says the deal is pro-consumer because it will bring 4G LTE services to 95 percent of Americans and will improve existing service by giving the combined entity more access to spectrum and cell towers, but consumer groups worry that with nearly 80 percent of all wireless customers served by just two companies, prices will inevitably rise and choices could be restricted.

Verizon's Dan Mead, on the other hand, argued that there's plenty of innovation in the wireless industry and that Verizon has enough spectrum to meet its needs for the forseeable future. Verizon may be worried that if it goes on record opposing the AT&T deal that itself might have trouble trying to clear future megadeals with the U.S. government.

Mead said his company did not look at acquiring T-Mobile. "We didn't think there was a need. We've been building through a series of great acqusitions and we're confident in where we're at for our customers." Earlier, Mead told Reuters (NYSE:TRI - News) that his company was likewise not interested in acquiring Sprint (NYSE:S - News), which quickly became the focus of much speculation about possible Verizon counter-moves.

Aside from talk of the proposed merger—which was all anyone basically wanted to hear—Cramer asked the CEOs about several wide-ranging topics in the wireless industry, such as the need for more spectrum, which was discussed at length by Genachowski in his remarks. Among those topics: metering (Mead is interested, Hesse isn't sure), poor wireless service (De La Vega said traffic management is the most difficult thing in wireless right now) and whether or not emerging powers like Facebook are friends to the wireless industry (all agreed that anybody who drives a lot of data usage is a friend).

Hesse got off by far the best lines on the panel. At one point, as De La Vega promoted the proposed merger's potential to bring 4G LTE service to so many Americans, he quipped, "I thought you and T-Mobile had 4G already?" It's a reference to the ongoing controversy over exactly what constitutes 4G speed, as well as AT&T's recent practice of advertising and selling phones labeled as 4G that don't have that capability turned on just yet, as AT&T completes the back-end network rollout needed for those speeds. He also broke into a question from Cramer meant for De La Vega about why mobile phone performance can be spotty, reminding Cramer of his complaints to Mead about the size of his wireless bill: "I thought you had Verizon service."

**Follow Yahoo! Finance on   Twitter; become a fan on   Facebook.**

Ex. E



**MOTODEV**

The Motorola developer network

# INTRODUCTION OF BASIC CONCEPTS IN OMA DRM

## V 1.0

**TECHNICAL ARTICLE**

Case 2:11-cv-02674-DDP-RZ   Document 1   Filed 03/30/11   Page 69 of 117   Page ID #:69



Copyright © 2007, Motorola, Inc. All rights reserved. This documentation may be printed and copied solely for use in developing products for Motorola products. In addition, two (2) copies of this documentation may be made for archival and backup purposes. Except for the foregoing, no part of this documentation may be reproduced or transmitted in any form or by any means or used to make any derivative work (such as translation, transformation, or adaptation) without express written consent from Motorola, Inc.

Motorola reserves the right to make changes without notice to any products or services described herein. "Typical" parameters, which may be provided in Motorola Data sheets and/or specifications, can and do vary in different applications and actual performance may vary. Customer's technical experts will validate all "Typicals" for each customer application.

Motorola makes no warranty in regard to the products or services contained herein. Implied warranties, including without limitation, the implied warranties of merchantability and fitness for a particular purpose, are given only if specifically required by applicable law. Otherwise, they are specifically excluded.

No warranty is made as to coverage, availability, or grade of service provided by the products or services, whether through a service provider or otherwise. No warranty is made that the software will meet your requirements or will work in combination with any hardware or application software products provided by third parties, that the operation of the software products will be uninterrupted or error free, or that all defects in the software products will be corrected.

In no event shall Motorola be liable, whether in contract or tort (including negligence), for any damages resulting from use of a product or service described herein, or for any indirect, incidental, special or consequential damages of any kind, or loss of revenue or profits, loss of business, loss of information or data, or other financial loss arising out of or in connection with the ability or inability to use the Products, to the full extent these damages may be disclaimed by law.

Some states and other jurisdictions do not allow the exclusion or limitation of incidental or consequential damages, or limitation on the length of an implied warranty, therefore the above limitations or exclusions may not apply to you.

This warranty gives you specific legal rights, and you may also have other rights, which vary from jurisdiction to jurisdiction.

Motorola products or services are not designed, intended, or authorized for use as components in systems intended for surgical implant into the body, or other applications intended to support or sustain life, or for any other application in which the failure of the Motorola product or service could create a situation where personal injury or death may occur.

Should the buyer purchase or use Motorola products or services for any such unintended or unauthorized application, the buyer shall release, indemnify and hold Motorola and its officers, employees, subsidiaries, affiliates, and distributors harmless against all claims, costs, damages, and expenses, and reasonable attorney fees arising out of, directly or indirectly, any claim of personal injury or death associated with such unintended or unauthorized use, even if such claim alleges that Motorola was negligent regarding the designing or manufacturing of the product or service.

Motorola recommends that if you are not the author or creator of the graphics, video, or sound, you obtain sufficient license rights, including the rights under all patents, trademarks, trade names, copyrights, and other third party proprietary rights.

If this documentation is provided on compact disc, the other software and documentation on the compact disc are subject to the license agreement accompanying the compact disc.

Introduction of Basic Concepts in OMA DRM

Version 1.1

July 2007

For the latest version of this document, visit http://developer.motorola.com

Motorola, Inc.

http://www.motorola.com

Technical Article



# Contents

Introduction .................................................................................................................. 4
DRM standards in the market ......................................................................................... 4
OMA DRM 1.0 model ..................................................................................................... 4
    Forward Lock ........................................................................................................... 5
    Combined Delivery ................................................................................................... 5
    Separate Delivery .................................................................................................... 6
Defects in OMA DRM 1.0. .............................................................................................. 6
OMA DRM 2.0. ............................................................................................................. 7
Difference between OMA DRM 1.0 and 2.0 ...................................................................... 9
Conclusion ................................................................................................................... 9
References. ................................................................................................................... 9

# Figures

Figure 1: Forward Lock and Combined Delivery. ............................................................... 5
Figure 2: Separate Delivery ............................................................................................ 6
Figure 3: DRM 2.0 Architecture Diagram from OMA Documents ......................................... 7
Figure 4: DRM 2.0 Message transfer. .............................................................................. 8

 *MOTODEV*

# *Abbreviations*

| | |
|---|---|
| **ACC** | Advanced Audio Coding |
| **AES** | Advanced Encryption Standard |
| **CEK** | Content Encryption Key |
| **DCF** | DRM Content Format |
| **DRM** | Digital Rights Management |
| **DRMREL** | DRM Rights Expression Language |
| **EMMS** | Electronic Music Management System |
| **IP** | Internet Protocol |
| **MMS** | Multimedia Messaging Service |
| **OMA** | Open Mobile Alliance |
| **PKI** | Public Key Infrastructure |
| **REK** | Rights Encryption Key |
| **REL** | Right Expression Language |
| **RI** | Rights Issuer |
| **RO** | Right Object |
| **ROAP** | Right Object Acquisition Protocol |
| **WAP** | Wireless Application Protocol |

 **MOTODEV**

## Introduction

Mobile phone users download ring tones, wallpaper, music, movies and games from service providers everyday. Content downloading is a huge part of the mobile business. DRM (Digital Rights Management) prevents the illegal distribution of content and protects the interest of the content owner.

This document introduces the basic concepts and mechanisms in Open Mobile alliance (OMA) DRM 1.0/2.0, and compares the differences between them.

## DRM standards in the market

Multiple incompatible DRM standards exist in the market. Below is a brief description of them.

### OMA DRM

OMA DRM is an open digital rights management standard published by Open Mobile Alliance. Most companies in the mobile industry, including many of the most popular operators and manufactures, take OMA DRM as their DRM standard. Now OMA DRM is the governing DRM standard in mobile industry. Two OMA DRM standards have been released: OMA DRM 1.0 was released in September 2002 and OMA DRM 2.0 published in March 2006.

### Microsoft Windows DRM

Windows Media DRM released in March 1999 is a private Digital Rights Management standard for the Windows PC and Windows mobile platform. It is designed to provide secure delivery of audio/video content over an IP network to a PC or other Windows mobile devices in such a way that the distributor can control how that content is used.

### Apple iTunes DRM

Apple DRM, also called Fairplay, is the private digital rights management technology created and used by Apple Inc. Apple DRM is used by the iPod and iTunes Store and plugged into Quicktime. The protected songs purchased from the iTunes Store with iTunes are encoded with Apple DRM. Apple DRM encrypts Advanced Audio Coding (AAC) audio files and prevents users from playing these files on unauthorized computers.

### Other Private DRM

Other private DRM techniques and products include IBM's EMMS, Adobe's Content Server and Macrovision's SafeAudio, and so on.

## OMA DRM 1.0 model

The OMA DRM 1.0 standard was released in September 2002 and is widely used in many mobile devices. It defines three application models, each of which is described in detail in the following section.

- Forward-lock
- Combined Delivery
- Separate Delivery

 **MOTODEV**

### Forward Lock

Forward Lock is frequently used for ring tones and wallpaper subscription and can effectively prevent illegal copying of files. In Forward Lock mode, the content is packaged and sent to the mobile terminal as a DRM message. The mobile terminal could use the content, but could not forward it to other devices or modify it. In Motorola handsets, the Forward Lock content is not encrypted when it is received or when stored in phone memory. When the .dm file is copied to a PC or memory card, it will be encrypted so as to make sure it cannot be used or transferred from the mobile terminal.

The file extension for a Forward Locked file is .dm, which includes the header and the encoded (but not the encrypted) content in it.

### Combined Delivery

Combined Delivery is an extension of Forward Lock. In Combined Delivery mode, the digital rights are packaged with a content object in the DRM message. The user could use the content as defined in the rights object, but could not forward or modify it. The rights object is written in DRMREL (DRM Rights Expression Language) and defines the number of times and length of time that the content can be used thus enabling the preview feature.

The file extension for a Combined Delivery file is also .dm, which includes the header, the Rights Object and encoded content.



**Figure 1: Forward Lock and Combined Delivery**



*MOTODEV*

### Separate Delivery

In the Separate Delivery mode, the content and rights are packaged and delivered separately. The content is encrypted into DRM Content Format (DCF) using a symmetric cryptograph method and can be transferred in an unsafe way such as Bluetooth, IrDA and via Email. The Rights Object and the Content Encryption Key (CEK) are packaged and transferred in a safe way such as an unconfirmed Wireless Application Protocol (WAP) push. The terminal is allowed to forward the content message but not the rights message.

Superdistribution is a Separate Delivery application which encourages digital content being transferred freely and is typically distributed over public channels. But the content recipient has to contact the retailer to get the Rights object and CEK to use or preview the content.

The encrypted content file type extension is .dcf (DRM Content Format); the right file extension is .dr or .drc.



Download
MMS
Bluetooth
IrDA
Email

WAP Push

Terminal

**Figure 2: Separate Delivery**

## Defects in OMA DRM 1.0

The OMA DRM 1.0 model is designed for the mobile industry and is based on the assumption that the mobile terminal is reliable. In the Forward-lock mode and the Combined Delivery mode, the content is not encrypted. In the Separate Delivery mode, the symmetric encryption key is not encrypted. The media content can be stolen if the mobile terminal is hacked or the Right Object message with the CEK is revealed.

 **MOTODEV**

# OMA DRM 2.0

The OMA DRM 2.0 standard was released in 2006 as an upgrade and extension of version 1.0. It supports many application scenarios like preview, download, Multimedia Messaging Service (MMS), streaming media, super distribution, and unconnected device, making the copyright protection more reliable and flexible. Most mobile devices in the market, including Motorola's handsets, do not support this version.

The OMA DRM 2.0 is composed of four parts:

- Public Key Infrastructure (PKI) security system
- Rights Object Acquisition Protocol (ROAP)
- DRM Content Format (DCF)
- Rights Expression Language (REL).

The Public Key-based Asymmetric Cryptography is used as the basic security mechanism.



**Figure 3: DRM 2.0 architecture diagram from OMA**

The diagram above is the DRM System model from OMA Documents. It looks like the Separate Delivery in DRM 1.0 but the Rights Object is signed and passed with the Public Key Infrastructure (PKI) mechanism to ensure security, authenticity and integrity. The DRM Agent is the entity in the device that manages permissions for media objects on the device. With the mobile DRM Agent, devices not connected to a network could use the DRM content.

**MOTODEV**



**Figure 4: DRM 2.0 content download and use**

The diagram above shows how the DRM 2.0 content is downloaded and used.

- First, the Content Issuer encrypts the original digital content with a symmetric cryptograph algorithm such as AES (Advanced Encryption Standard). The original content is packaged into a DCF-formatted Content Object (CO) and sent to the Content User. The CO does not include the Cryptograph Encryption Key.

- Second, the DRM agent contacts the Rights Issuer (RI) to get the Right Object (RO) which is generated and managed by RI. In the commercial application this step is fee-based. The CA (Certificate Authority), who issues and verifies certificate, helps the RI and the content user authenticate each other. The RI enciphered the RO with user's public key; then uses the message digest method to get the hash value and signs the RO with RI's private key. After receiving the RO, the user checks the message signature with the RI's public key and decrypts the RO with the user's public key.

- Third, the user gets the content message digest and symmetric encryption key from RO. Then using the symmetric key to decrypt the CO and comparing the message digest with the content, makes sure it has not been changed. The DRM agent will record the Rights constraint from the RO and control how the content can be used accordingly.

The image at top is the logo.

 **MOTODEV**

## Difference between OMA DRM 1.0 and 2.0

|  | OMA DRM 1.0 | OMA DRM 2.0 |
|---|---|---|
| **Application mode** | Supports Forward-lock, Combined Delivery, Separate Delivery in content download. | Supports download, MMS, streaming media and many application scenarios like preview, super distribution, unconnected devices, etc. |
| **Domain support** | No domain support. | Domain support for a set of devices sharing the same rights. |
| **Mobile phone Support** | A lot of handheld devices support OMA 1.0 including almost all 3G terminals. | Few terminals support it. |
| **Security** | Based on the assumption that the terminal is reliable, not secure enough. | Base on the assumption that the terminal is not reliable. The terminal and the server should authenticate each other using the certificates. |
| **Deployment** | Easy to deploy | Hard to deploy, CA and certificate system required. |

**Table 1: Differences between OMA DRM 1.0 and 2.0**

## Conclusion

DRM protects the value chain of content download and other value added services. With DRM, the content owner can be properly paid and encouraged to make more valuable content. Motorola supports OMA DRM 1.0 in most handsets and will support OMA DRM 2.0 in the near future.

## References

Open Mobile Alliance DRM 1.0

http://www.openmobilealliance.org/release_program/drm_v1_0.html

Open Mobile Alliance DRM 2.0

http://www.openmobilealliance.org/release_program/drm_v2_0.html

Microsoft Windows Media DRM

http://www.microsoft.com/windows/windowsmedia/forpros/drm/default.mspx

Apple DRM

http://www.apple.com/support/itunes/store/authorization/

http://en.wikipedia.org/wiki/FairPlay

Ex. F

**sonera | medialab**

# Mobile Digital Rights Management White Paper

Sonera MediaLab

www.medialab.sonera.fi
info@medialab.sonera.fi

August 6, 2003

Copyright © 2003 Sonera MediaLab

This document is provided *as is* without any warranty of any kind.
The opinions expressed herein are subject to change without notice.

# Mobile Digital Rights Management

## 1 Introduction

Digital Rights Management (DRM) is a technology that protects content owner rights when selling and distributing content online in a digital form. DRM also introduces new ways of selling, distributing and consuming content that can be considered as important as the prevention of piracy. With DRM, content owners and retailers can configure usage rules that allow business models such as "try before you buy", promotional previews, rentals based on play counts or expiration dates, subscriptions, and purchases of streaming or downloadable media.

While mobility presents some special requirements and limitations, it also creates new possibilities for DRM. Some of the limitations arise from the mobile devices themselves: they have limited processing power, memory, and data transmission capabilities and thus cannot use as strong and complicated encryption technologies as PCs connected to the broadband Internet. Today, key management and trust establishment in PC DRM systems are based on public key infrastructure (PKI) concepts. One of the new possibilities for DRM on mobile phones is microbilling, where fees for DRM protected content can be added to the phone bill, a technique that is not widely available for PCs.

This paper focuses on Mobile Digital Rights Management (MDRM). As end-terminals we consider the following mobile devices: basic and messaging phones, smart phones and PDA based phones. We have not taken into account other mobile devices such as laptops, handheld or tablet PCs, stand-alone PDAs, or music players integrated to mobile phones.

We start with a brief description of the current status of MDRM, then cover the standardization efforts currently under work, and at the end describe what MDRM systems could look like in a couple of years.

## 2 Mobile DRM Today and the Future Roadmap

Downloadable content for mobile phones today consists mainly of ringing tones and logos. The mechanism used to protect the rights of content owners is called *forward-lock*, a hard-coded feature inside the phone that prevents the user from copying or forwarding the downloaded content outside the phone. Actually, forward-lock cannot be considered as an actual DRM system, at least an intelligent one, but it is included in this paper to describe where the technology stands today. Forward-lock does not have usage rules or any other way to describe usage rights. The concept relies solely on the hardware implementation of the terminal manufacturer (see Figure 2-1).



Figure 2-1. Forward-lock

The hardware lock scheme was implemented by some manufacturers on their mobile phones before the standardization activities of the Open Mobile Alliance (OMA). Forward-lock is now one of the delivery methods for OMA DRM specification release 1 (see chapter 3.2) and it provides the simplest and most rudimentary standardized method for controlling content delivery for mobile phones.

Looking to the future, several topics need standardization: format of content container, content encryption, language used to express rights, delivery of content and rights to mobile device, trust establishment, and encryption key management. A single standard is crucial because several different MDRM solutions cannot be implemented due to the limited processing power and memory of the mobile devices, although phones are approaching PCs capability and function wise in the coming years.

Figure 2-2 portrays a MDRM roadmap for the near future. In the mobile world, DRM is in the process of being incorporated into the base operating systems and hardware instead of being a software add-on. We predict that current proprietary DRM solutions move towards standards compliance in order to take advantage of interoperability benefits and operating system and hardware support. Also, new standards based solutions are emerging (currently, for example, Nokia Delivery Server and Content Publishing Toolkit 2.0, ACCESS PCCS). Major players in the wired Internet field are also likely to enter the mobile DRM space. Microsoft has already started pushing its DRM solution into the Smartphone and Pocket PC Phone Edition operating systems. RealNetworks also offers a DRM solution, Media Commerce Suite, and works closely with Nokia in audio/video streaming.

Based on this roadmap, we will in the following chapters take a closer look on the standardization efforts and platforms for MDRM.



Figure 2-2. Mobile DRM roadmap

# 3 Mobile DRM Standardization and Initiatives

In this chapter we will introduce the standardization forums working on MDRM and describe some results of their efforts.

## 3.1 3GPP

Third Generation Partnership Project (3GPP) is a collaboration agreement between a number of standardization organizations established in December 1998. 3GPP's goal is to provide globally applicable technical specifications for third generation mobile communications (3G) systems [1]. There are currently almost 500 members including mobile operators such as TeliaSonera.

3GPP planned to introduce their MDRM specifications in release 6 of their set of standards in mid 2003. However, in September 2002 the responsibility of 3GPP's MDRM standardization work was transferred to Open Mobile Alliance (OMA, see sub-chapter 3.2) and 3GPP is no longer actively working with DRM. 3GPP had completed the specifications up to stage 1, providing a set of requirements for enabling DRM. The requirements document describes DRM in general terms and sets requirements for the user and user equipment (device), usage rights, security, privacy, and charging [2].

## 3.2 OMA

Open Mobile Alliance (OMA) was founded in June 2002 by the Open Mobile Architecture initiative and WAP Forum. OMA's goal is to introduce open standards and specifications based upon market and customer requirements for mobile industry [3]. Among the almost 300 members are such companies as Ericsson, Microsoft, Motorola, Nokia, Openwave, Siemens, DoCoMo, Vodafone, and Sonera.

Version 1.0 of OMA's MDRM specification was approved in September 2002. This version concentrates on having an early-stage simplified MDRM standard that can be implemented rapidly. The standard is developed mainly to solve two problems. Firstly, there is no standardized way of preventing illegal peer-to-peer content delivery that exists on phones without forward-lock. Secondly, mobile phone users have no easy and practical way to preview content before purchasing it [4]. Therefore, the standard focuses on forward-lock and preview features but also deals with the evolution path to more comprehensive DRM. In practice, version 1.0 of the OMA MDRM standard defines three methods: forward-lock, combined delivery, and separate delivery (see Figure 3-1).

OMA has chosen the XML based Open Digital Rights Language (ODRL) as the basis of their digital rights expression language for content. Nokia is probably the most notable ODRL supporter, although other organizations have also supported it (for example, Adobe, IBM, Panasonic, and RealNetworks supported the selection of ODRL for the MPEG-21 rights expression language). The specification has also been submitted to the W3C and published as a W3C Note. The language can be used with digital content such as e-books, music, audio, and software. ODRL is freely available and has no licensing constraints [7].

 © 2003 Sonera MediaLab

sonera | medialab



Figure 3-1. Three delivery methods defined by OMA DRM

## Forward-lock

OMA forward-lock is based on the currently used hard coded forward-lock. The content is pack-aged into a DRM message that is transported into the mobile device by using for example HTTP, WAP download, or MMS. The technology is transport independent. The mobile device renders the content according to semantics defined for the DRM message. The standard states that the device is allowed to play, display, execute, and print the media object without any con-straints, but not forward the content [4].

## Combined Delivery

Forward-lock can be seen as a special case of combined delivery. The difference is that with combined delivery, the rights object or usage rules are packaged with the actual content into the DRM message. The rights object defines how the mobile phone is allowed to consume the con-tent. Content providers can set rights for playing, displaying, executing, and printing. The mo-bile phone cannot forward content that has been delivered using combined delivery. A typical usage scenario for combined delivery is preview.

## Separate Delivery

In separate delivery the content and the usage rights are delivered into the mobile phone using separate channels. The content delivery is transport independent, but rights are delivered using WAP push.

The content must be encrypted and converted into DRM Content Format (DCF) [13]. A DCF object cannot be used without Content Encryption Key (CEK), contained by the separately deliv-ered rights. When the mobile device has received both the content and the corresponding rights, it renders the content according to the semantics used. In separate delivery the mobile phone is allowed to forward the DCF object to another device. Rights containing the CEK cannot be for-warded. To view the content, the user of the other device must request for new rights and CEK. With this feature, separate delivery allows superdistribution, that is, peer-to-peer distribution among friends and communities. The mobile phone user can distribute content freely and still the content provider gets compensated thanks to the separate delivery mechanism.

   © 2003 Sonera MediaLab

**sonera | medialab**

The usage rules and the decryption key can be delivered to a mobile phone in only a few seconds, since the amount of data transferred is only a couple of bytes. WAP push can be used for quick and easy delivery of such information. It should be noted that Wireless Service Protocol (WSP) or HTTP can be used as the WAP push protocol. When using WSP, the rights object can be usually fit in a single SMS message. SMS is available in most current mobile networks and provides transport level reliability. However, using SMS as the rights delivery channel has also a downside: every SMS message sent costs something to the operator, service provider, or customer, which adds an extra cost to the downloaded or received content.

## 3.3    MPEG

The Moving Picture Experts Group (MPEG) was established in January 1988. MPEG is a working group inside the International Organization for Standardization (ISO) and it defines global standards for the compression, decompression, processing, and coded representation of moving pictures and audio. So far, MPEG has produced or is working on five ISO standards: MPEG-1, MPEG-2, MPEG-4, MPEG-7, and MPEG-21. MPEG uses the term Intellectual Property Management and Protection (IPMP) for DRM and it is incorporated in the MPEG-4, MPEG-7, and MPEG-21 standards. MPEG-4 can be described as a standard for multimedia for the fixed and mobile web, MPEG-7 as a standard for the description and searching of multimedia content, and MPEG-21 as a multimedia framework targeted for bringing together the existing elements of delivery and consumption of multimedia content. IPMP Extensions for MPEG standards should be available in 2003 according to the MPEG work plan [5]. The IPMP framework is expected to be given international standard status in late 2004.

The IPMP Extensions do not actually standardize DRM systems, only the DRM interface which can be used by third party DRM system applications. For more information on DRM in the MPEG-4 standard, see [10] and [11].

MPEG has decided to use the XML based eXtensible rights Markup Language (XrML) as the digital rights expression language for the MPEG-21 standard. ContentGuard., a Xerox spin-off company formed in April 2000 by Xerox and Microsoft, licenses the XrML specification to the industry royalty-free. ContentGuard has patented XrML and in fact the whole concept of digital rights languages in the USA.

XrML is intended to support the commerce of digital content, such as publishing and selling of e-books, movies, music, games, and computer software. In addition, it is designed to support the specification of access and usage control for secure digital rights objects and services [6]. Companies that support XrML include Adobe, HP, Xerox, and Microsoft. XrML is very similar to ODRL which is considered to be less complicated than XrML. As open source software it is more likely to attract different DRM system vendors than XrML. ODRL is also compliant with MPEG-21.

# 4    MDRM Platforms

The amount of infrastructure required depends on the DRM solution and requirements. For example, the simplest OMA DRM 1.0 Forward Lock does not necessarily require any additional infrastructure at all. A simple HTTP server is adequate if charging is not required. OMA DRM 1.0 infrastructure requirements are outlined in Table 1.

sonera | medialab

Table 1. Infrastructure required by OMA DRM 1.0

| Delivery Method | Required DRM-specific Infrastructure |
|---|---|
| Forward Lock | None. Content can be wrapped in a DRM message and placed on a HHTP server. |
| Combined Delivery | Optional if dynamic rights are required, otherwise same as above. |
| Separate Delivery | Rights & key management |
| (Future PKI-based) | (Rights, key, and certificate management) |

A possible OMA DRM platform operation is illustrated in Figure 4-1 (based on Nokia Delivery
Server [14] operation). First, the user browses and discovers interesting content, decides to buy
it and clicks the 'purchase' button on a mobile portal (1). The mobile portal generates a
download order for the content (2). The order identifies the content and contains rights and
price information. The download is then returned to the client (3). The client contacts the
download server to get the actual content (4). The download server authenticates the client (5),
fetches the actual content from content storage (6) and returns the content to the user (7). At
the same time the server pushes rights for the content to the client. After the content and rights
have been delivered to the client, the delivery server generates charging information (8).



Figure 4-1. MIDRM platform operation

Announced OMA DRM 1.0 capable delivery platforms include Nokia Delivery Server 2.0 [14],
DMDSecure DMDMobile [15], and ACCESS PCCS [16].

**sonera | medialab**

# 5   The Future: DRM System with Trust and Security Model

From a security point of view, the current mobile DRM standard, OMA DRM 1.0, is quite lightweight. The rights object or the content encryption key (CEK) is not protected. The device or the DRM Agent is not authenticated prior to issuing rights. All this makes it relatively easy to circumvent the DRM protection.

The next release of OMA DRM is believed to include a more sophisticated trust and security model. Typically, such a model is based on public key infrastructure (PKI) concepts, although other methods are also possible. In PKI, trust and key management is based on public key cryptography, certificates, digital signatures and trusted third parties (certification authorities).

In a more advanced system, each DRM Agent and/or device has a proof of its compliance, and this proof is presented to the rights issuer before the rights and the CEK for the content are issued. Also, it is possible for the device (user) to authenticate the rights issuer in a similar way. The rights object and the corresponding key are bound to the device so that it is useless in any other device. Therefore, the rights can be delivered using any delivery method, not only WAP PUSH. The system also makes it possible to revoke compromised devices so that no new content (rights) is issued.

Naturally, more advanced security makes the system more complicated. In the case of PKI, each device needs a private/public key and a certificate in tamper-resistant storage. It is also necessary to authenticate any DRM Agent (for example media player) that tries to access the sensitive information. Also, on the server side, more infrastructure is needed. Software implementers, device manufacturers and content providers (rights issuers) need mutual trust which in a PKI system is implemented as a trust hierarchy. This means certification authorities, certification procedures, and mechanisms for delivering the information on compromised devices and software (for example, certificate revocation lists).



**Figure 5-1. Content delivery in a PKI based DRM system**

Content delivery in a PKI based DRM system (Figure 5-1) is quite similar to the separate delivery case. However, in this case the device's compliance is checked before the rights are granted. Also, the rights are protected (for example, encrypted with the device's public key).

sonera | medialab

# 6    Summary

Digital Rights Management is the key to protect content owner rights while at the same time enabling completely new ways for distributing content among friends and communities. This superdistribution capability seems to have a lot of potential in the mobile world. Although content services on the Internet have not yet taken off on a major scale, people are already used to the superdistribution of content (jokes, pictures, music, video clips, etc.) using email and other services. In the mobile world, where one has the possibility of using operator's monthly subscription bill to aggregate microtransactions, people are thought to be willing to pay for polyphonic ringing tones, java games, screen savers, etc. This DRM protected commercial content could be downloaded from content servers, by MMS, or by superdistribution from one's friends.

In this paper we have described the status of MDRM today. DRM technology is currently in its early development stage and not at least until mid 2003 can we expect to have first experiences. The current version of the OMA DRM specification only includes forward-lock, combined delivery and separate delivery as simple MDRM mechanisms, but OMA's initial work can nevertheless be considered as a big step forward in the standardization process.

MDRM is becoming a reality – for example Nokia have committed to the OMA standard and has announced their first products (delivery server, content publishing toolkit) and client devices (Nokia 6220, available in the second half of 2003) that implement the OMA DRM 1.0 specification. In addition to Nokia, also other companies (for example, ACCESS, DMDSecure) are bringing OMA DRM solutions to the market and mobile operators, for example Vodafone, are embracing OMA DRM.

The development towards a more sophisticated MDRM system has already started at OMA. This system presumably has a trust and security model, for which one well-known solution is the public key infrastructure (PKI) based approach. The next OMA DRM release is expected in the late 2003 – early 2004 range, and first products some time after that.

The next 12-18 months will be very interesting from the mobile DRM point of view. And after a few years, if DRM proves to be feasible, we will probably see a unified DRM solution or at least a set of interoperable DRM systems. In fact, the unobtrusive and seamless operation across different devices and environments is crucial for the wide adaptation and acceptance of DRM in the future. After all, DRM works behind the scenes, and in normal use its operation should be almost invisible to the end user.

**sonera | medialab**

## References

[1]     3GPP Partnership Project Description, Dec 2-4, 1998, Available from:
        http://www.3gpp.org/About/3GPP.ppt [Accessed Aug 26, 2002]

[2]     3GPP TS 22.242 V6.0.0, Jun 2002, Available from:
        http://www.3gpp.org/ftp/Specs/archive/22_series/22.242/ [Accessed Aug 28, 2002]

[3]     Open Mobile Alliance Overview, Jun 2002, Available from:
        http://www.openmobilealliance.org/docs/OMA%20public%20overview%20aug2002.p
        df [Accessed Sep 2, 2002]

[4]     OMA Digital Rights Management, Version 1.0, Sep 2002, Available from:
        http://www.openmobilealliance.org/docs/OMA-Download-DRM-v1_0-20020905-
        a.PDF [Accessed Sep 12, 2002]

[5]     MPEG Work Plan, Available from: http://mpeg.telecomitalialab.com/workplan.htm
        [Accessed Sep 4, 2002]

[6]     eXtensive rights Markup Language, Version 2.0, Available from:
        http://www.xrml.org/reference/XrMLTechnicalOverviewV1.pdf [Accessed Sep 2,
        2002]

[7]     Open Digital Rights Language, Version 1.1, Aug 2002, Available from:
        http://odrl.net/1.1/ODRL-11.pdf [Accessed Oct 7, 2002]

[10]    MPEG-4 Intellectual Property Management & Protection (IPMP) Overview & Appli-
        cations, Dec 1998, Available from:
        http://mpeg.telecomitalialab.com/working_documents/mpeg-04/systems/ipmp.zip [Ac-
        cessed Dec 3, 2002]

[11]    MPEG-21 Part 4: MPEG-21 Intellectual Property Management and Protection
        (IPMP), Version 5, Oct 2002, Available from:
        http://mpeg.telecomitalialab.com/working_documents/mpeg-21/ipmp/ipmp.zip, [Ac-
        cessed Dec 3, 2002]

[12]    DRM Whitepaper, Sonera Plaza Medialab, Feb 2002, Available from:
        http://www.medialab.sonera.fi/workspace/DRMWhitePaper.pdf [Accessed Sep 4,
        2002]

[13]    OMA DRM Content Format, Version 1.0, Sep 2002, Available from:
        http://www.openmobilealliance.org/docs/OMA-Download-DRMCF-v1_0-20020913-
        a.PDF [Accessed Dec 3, 2002]

[14]    Nokia Delivery Server Datasheet. Available from:
        http://www.nokia.com/pc_files_wb2/Delivery_%20Server_%20Data_%20Sheet.pdf
        [Accessed May 28, 2003]

[15]    DMDSecure DMDMobile. Available from:
        http://www.dmdsecure.com/DMDmobile.htm [Accessed May 28,2003]

[16]    ACCESS Premium Content Subscription Server. Available from: http://www.access-
        us-inc.com/products/spcss.asp [Accessed May 28,2003].

**sonera | medialab**

## Additional Resources

### Initiatives, Forums and Associations:

| | |
|---|---|
| 3GPP | www.3gpp.org |
| MPEG | mpeg.telecomitalialab.com |
| OMA | www.openmobilealliance.org |
| XrML | www.xrml.org |
| ODRL | www.odrl.net |

## Definitions, acronyms and abbreviations

| | |
|---|---|
| 3G | Third Generation Mobile Communications Technology |
| 3GPP | Third Generation Partnership Project |
| DRM | Digital Rights Management |
| HTTP | Hypertext Transfer Protocol |
| IPMP | Intellectual Property Management & Protection. MPEG's definition for DRM |
| MDRM | Mobile Digital Rights Management |
| MMS | Multimedia Message Service |
| MPEG | Moving Picture Experts Group |
| ODRL | Open Digital Rights Language |
| OMA | Open Mobile Alliance |
| PKI | Public Key Infrastrucure |
| SMS | Short Message Service |
| Superdistribution | Peer-to-peer content distribution |
| WAP | Wireless Application Protocol |
| XrML | eXtensive rights Markup Language |

Ex. G

Inter Carrier MMS Messaging Guidelines v.05



# Inter-Carrier MMS Messaging Guidelines

## Feature Set & Interfaces

## Revision: 1.0

## Date:  October 21, 2004

Inter Carrier MMS Messaging Guidelines v.05

## Notice to Readers

This document does not contain any confidential material critical to the business of any carrier and is therefore not a controlled document. Copies may be made anytime by any carrier or ICV for internal use only. As new versions become available they will be distributed to all involved carriers.

To ensure consistency of the versions and correct distribution this document is managed by CTIA. Any changes to this document should be done with the "track changes" feature of Microsoft Word and submitted to the document manager Robert Mesirow (RMesirow@ctia.org) or Brandie Proctor (brandie.proctor@verizonwireless.com) for approval by the Carrier Group and further distribution.

## Revision History

| Version | Date | Reason for Issue | Revised By |
|---------|------|------------------|------------|
| 0.1 | 7/20/04 | Initial Draft | Brad Blanken |
| 0.2 | 7/22/04 | Sub group re-work | Marwan Afana |
| 0.3 | 8/3/04 | US Cellular and Cingular Comments | Brad Blanken |
| 0.4 | 9/24/04 | Inclusion of carrier comments | Brad Blanken |
| 0.5 | 10/5/04 | Edits based on face to face meeting | Brad Blanken |
| 1.0 | 10/20/04 | Final revision prior to CTIA announcement of intention of all involved carriers to participate in Inter-Carrier MMS Messaging | Brandie Proctor |

Inter Carrier MMS Messaging Guidelines v.05

# Distribution List

| CARRIER | CONTACT NAME | EMAIL |
|---|---|---|
| ALLTEL | Terry Roush<br>Brian Robertson | terry.g.roush@alltel.com<br>brian.e.robertson@alltel.com |
| AT&T WIRELESS | Jim Grams | jim.grams@attws.com |
| CINGULAR WIRELESS | Lynne MacKinney<br>Leslie Moore<br>Matt Kaiser | lynne.mackinney@cingular.com<br>leslie.moore@cingular.com<br>matt.kaiser@cingular.com |
| CTIA | Robert Mesirow<br>Mike Altschul | rmesirow@ctia.org<br>lawman@ctia.org |
| CELLULAR SOUTH | Greg Latour | glatour@cellularsouth.com |
| DISNEY | Kristen Logan | Kristen.logan@disney.com |
| DOBSON CELLULAR | Dianna Sanders<br>Mark Wadman | Dianna.Sanders@dobson.net<br>Mark.wadman@dobson.net |
| CRICKET | Marwan Afana<br>Ron Seager<br>Maureen Backe | marwan.afana@ieee.org<br>rseager@cricketcommunications.com<br>mbacke@cricketcommunications.com |
| METROPCS | R Unger | RUNGER@METROPCS.COM |
| NEXTEL | David Boals<br>David Norloff<br>Ramon Dadoo<br>Mark Simpson | david.boals@nextel.com<br>david.norloff@nextel.com<br>Raman.Dadoo@Nextel.com<br>mark.simpson@nextel.com |
| SPRINT PCS | Brian Smith<br>Brian Barrett<br>Donnie Townsend<br>Patrick Wilson | Brian.t2.smith@mail.sprint.com<br>Brian.Barrett@mail.sprint.com<br>Donnie.d.townsend@mail.sprint.com<br>Patrick.d.Wilson@mail.sprint.com |
| US CELLULAR | Narothum Saxena<br>Jim Biel<br>Claudio Taglienti | narothum.saxena@uscellular.com<br>jim.biel@uscellular.com<br>Claudio.Taglienti@uscellular.com |
| VERIZON WIRELESS | Jack Mcartney<br>Jerry Kupsh<br>Brandie Proctor | Jack.McArtney@VerizonWireless.com<br>Jerry.Kupsh@VerizonWireless.com<br>Brandie.Proctor@VerizonWireless.com |
| T-MOBILE | Adrian Buzescu<br>Uwe Mayer | Adrian.buzescu@t-mobile.com<br>UWE.MAYER@T-MOBILE.COM |
| WESTERN WIRELESS | | |

Inter Carrier MMS Messaging Guidelines v.05

# Definitions and Abbreviations

| Term | Meaning |
|---|---|
| MM1 | The protocol between the MMSC and the UA as specified in the 3GPP 23.140 standard |
| ICV | Inter-Carrier Vendor |
| MM | Multimedia Message |
| MM4 | The protocol between the MMSC another MMSC as specified in the 3GPP 23.140 standard.. |
| MMSC | Multimedia Messaging Service Center |
| MSISDN/MDN | Mobile Subscriber ISDN / Mobile Directory Number |
| SLA | Service Level Agreement |
| UA | MMS User Agent (i.e., mobile handset/device) |

Inter Carrier MMS Messaging Guidelines v.05

# Table of Contents

1  Introduction..................................................................................................6

   1.1  Purpose ............................................................................................6

   1.2  Mission Statement ...........................................................................6

   1.3  Scope................................................................................................6

   1.4  Out of Scope ....................................................................................6

2  Interfaces.......................................................................................................8

   2.1  MM4 (MMSC to MMSC) or (MMSC to ICV) Interface.......................10

   2.2  ICV to ICV interface.........................................................................10

3  Feature Sets ................................................................................................11

4  Spam..........................................................................Error! Bookmark not defined.

5  Inter-working between ICVs.........................................................................13

6 Method of Inter-Carrier Billing ......................................................................14

7  Transcoding Responsibility .........................................................................14

8  Delivery Reports and Read Replies .............................................................15

9  Minimum/Maximum Message Size ...............................................................16

10  Throttling over MM4.....................................................................................17

11  Legacy Support ...........................................................................................18

12  Unsupported Media Type Treatment ...........................................................19

13  Digital Rights Management (DRM) ...............................................................20

14  Service Level Agreements ..........................................................................21

15  Message Bundling and Unbundling .............................................................22

16  Testing ........................................................................................................23

Inter Carrier MMS Messaging Guidelines v.05

# 1 Introduction

## 1.1 Purpose

The purpose of MMS Interoperability is to ensure that carriers can pass mobile-originated Multimedia Messages (MMs) across participating carriers' networks .

The group's objective is to identify and define the involved interfaces, and to agree upon a common feature set that will be supported by all participating carriers.

At the first Inter-Carrier MMS Messaging meeting in Washington, DC on May 11, 2004, all participating carriers agreed that they have the intent to interoperate in inter-carrier MMS messaging. This service enables wireless subscribers to send and receive MMS messages based on their phone number (MSISDN/MDN) to and from any wireless network while in their home markets. Furthermore, they committed to participate in the process to work toward achieving Inter-Carrier MMS Messaging.

## 1.2 Mission Statement

**Enable phone number addressed mobile-to-mobile MMS messages across participating wireless carrier networks in the U.S.**

## 1.3 Scope

As a result of the discussions in Washington, DC, the group agreed to continue discussions on the following:

- Technical Implementation Options
- A Common Feature Set, based on the definition of the available interfaces or standards
- Method of Inter-Carrier Billing
- Transcoding Responsibility
- Listing of Common and Individually Supported Media Types
- Third Party Inter-Carrier MMS Gateway (ICV) Basic Rules
- Delivery Reports and Read Replies
- Maximum Message Size
- Throttling over MM4
- Message Bundling and Unbundling
- Legacy Support
- SLA Recommendation
- DRM
- E-mail and / or SPAM & Viruses

## 1.4 Out of Scope

The following products and services are outside the scope of this document:

- Marketing Plans or Pricing of Services
- Reporting on Part of Participating Carriers

Inter Carrier MMS Messaging Guidelines v.05

- Recommendation / Selection of ICVs
- Roaming
- Reply Charging
- Testing

Inter Carrier MMS Messaging Guidelines v.05

## 2  Interfaces

There are several different options available to interconnect the various carriers to enable Inter-Carrier MMS Messaging.

The following three main scenarios have been discussed:

1. Each participating carrier independently selects an ICV to act as its message transfer point.

2. The participating carriers agree to interconnect their networks directly.

3. The participating carriers deploy a hybrid model where they directly connect in some cases and use an ICV in others.

Since the definition of the interface in case 2 is solely between the two carriers this document only focuses on the cases 1 and 3.

Furthermore, this document does not discuss any network-specific, internal interfaces (e.g., features on the air interface, etc.) unless they have impact on the available feature set.

The following diagram shows four different carriers with the mobile station and their MMSC, as well as three independent ICVs acting as message transfer gateways.

In general there are two different main interfaces available. The MM4 interface describes the connection and feature set between a carrier and an ICV. Interface B describes the connection and feature set between two ICVs. If there is one common ICV interface B is not required.

Since every carrier can have a different feature set between their network and the ICV they are indexed with the carrier number (MM4-1, MM4-2, MM4-3 and MM4-4).

The interface between carriers directly connecting is identified by MM4-5.

Inter Carrier MMS Messaging Guidelines v.05



Inter Carrier MMS Messaging Guidelines v.05

## 2.1   MM4 (MMSC to MMSC) or (MMSC to ICV) Interface

This is a standard interface covered in the Definitions and Abbreviations section.

## 2.2   ICV to ICV interface

Out of Scope.  This connectivity and protocol support arrangement should be decided between the ICVs themselves.

The carrier community agrees that in order to support the ubiquity of Inter-Carrier MMS Messaging, we promote ICV to ICV connectivity and promote the wish that this connectivity not unreasonably be withheld.

Inter Carrier MMS Messaging Guidelines v.05

# 3   Feature Sets

Each participating carrier will handle inbound MMS messaging traffic with their own network capabilities and feature sets. Message types and feature sets are defined later in this document.

The following media types will be supported (at a minimum) by the participating carriers.  Support does not imply device capability, but rather infrastructure support (i.e., transcoding can be performed at the terminating network).

- MIDI
- SP-MIDI
- JPEG
- PNG
- 87a GIF
- BMP
- Text
- SMIL
- AMR
- H.263 Video (.mp4, .3g2 and .3gp)
- QCELP

Inter Carrier MMS Messaging Guidelines v.05

# 4   Spam

Several carriers voiced concerns about the possibility of Spam from certain users.  The risk of Spam will be mitigated as follows:

1.   Inter-Carrier Messaging service is limited, by definition, to "MMS messages sent from a mobile phone number to a mobile number **across wireless carrier networks only."**

2.   Each participating operator has the responsibility to send over the MM4 connection only MMS messages that originate from a mobile subscriber.

   a.   Web portal-originated messages may optionally be classified as "Mobile-Originated" in the following circumstances:

      1)   If a Legacy Customer (see Section 12) receives an MMS message and visits the Legacy Web site to view / listen to the MMS message, the carrier may opt to allow the recipient of the Legacy message to reply to the sender to facilitate and encourage message exchange.

      2)   This reply may be an MMS or may be sent as SMS.  In either case, the recipient should only be permitted to reply to the sender.  That is, the recipient may not be permitted to add additional addresses or to overwrite the address of the original sender.

The message must contain a valid originating PLMN number for these messages (i.e., the MSISDN/MDN of the original recipient).

3.   Messages from any other source (fixed or wireless) are not within the scope of these MMS Inter-Carrier Messaging guidelines, and are not permitted as MMS messages. Such messages include the following (Note: the carrier group is currently exploring alternative business models and may add an addendum to this document extending the range of Inter-Carrier MMS Messaging):

   ▪   Any Third Party application provider being connected to any carrier's MMSC (e.g., ringtone and picture messaging providers, business applications, VASPs, etc.)

   ▪   Any other messaging web interfaces (http), except as noted in 2a above.

   ▪   Any wireless Internet gateway (e-mail) or any other type of fixed-to-mobile messaging interface

4.   Carriers and ICVs should commit to monitoring and blocking any identified Spam attacks (e.g., parties connecting a wireless device to a computer or similar device and using other software components to originate Spam messages ) as part of normal business operations, including throttling message flow per MM4, blacklisting of certain MSISDN/MDNs, etc.

# 5   Inter-Working between Inter-Carrier Vendors

In the case of more than one Inter-Carrier Vendor (ICV) being involved in the end-to-end delivery chain, it is desirable to define clear responsibilities for all involved parties to avoid finger-pointing in case of problems.

The delivery chain (with two ICVs) can be divided into 5 different areas:

1. MO-Carrier MS to MO-Carrier MMSC (Originator handset to Originator MMSC) MM1)
2. MO-Carrier MMSC to MO-inter-carrier vendor (Originator MMSC to ICV) (MM4)
3. MO-inter-carrier vendor to MT inter-carrier vendor (ICV to ICV) (not defined)
4. MT-inter-carrier vendor to MT-Carrier MMSC (ICV to Recipient MMSC) (MM4)
5. MT-carrier MMSC to MT carrier MS (Recipient MMSC to Recipient handset) (MM1)

Areas 1,2,4,5 are fully in control by the MO and MT carriers and their relationships with their ICVs. SLAs between the parties ensure a defined level of availability.

In case of interface 3 (i.e., ICV Peering) the interface is out of scope for this document.



Inter Carrier MMS Messaging Guidelines v.05

# 6   Method of Inter-Carrier Billing

The Carrier Group agreed to the "Bill and Keep" billing and settlement model for MMS Inter-Carrier Messaging.  Bill and Keep is defined as each carrier billing their own subscriber for services and keeping the revenue gained by providing the service, with no settlement taking place between the carriers themselves.

Consumer service pricing is outside of the scope of this document and must be determined by each individual carrier.

Inter Carrier MMS Messaging Guidelines v.05

# 7  Transcoding Responsibility

Transcoding responsibility will be on the terminating carrier's network, either in the carrier's MMSC or through a third party contracted by the terminating network (i.e, an ICV). The content types in section 3 of this document are the supported types for Inter-carrier MMS Messaging. The current list of supported content will be updated on an "as-needed" basis and the Carrier Group will continue to meet in order to update these guidelines.

The originating carrier that sends an unsupported media type understands that the terminating carrier may not be able to support the delivery of the message.

Inter Carrier MMS Messaging Guidelines v.05

# 8   Delivery Reports and Read Replies

## Delivery Reports

1. If an agreement exists between operators, the originating MMSC may request a Delivery Report, on MM4, regardless of whether the originating mobile device requested the Delivery Report. Then, if the originating MMSC requests a Delivery Report, the terminating MMSC shall generate a Delivery Report for each MM for which a Delivery Report has been requested.

    Note: This requirement is covered in 23.140 3GPP release 6 (i.e. v6.5.0, 2004-03)

2. If a Delivery Report has been requested by the originating mobile device but the recipient mobile device denies the Delivery Report confirmation, the participating networks should adhere to the standards referenced above.

3. When using MM4, the originating MMSC shall route an MM forward to the terminating MMSC using the MM4_forward.REQ, which contains MMS control information and the MM content.

The terminating MMSC shall respond with a MM4_forward.RES, which provides the status of the request if an MM4_forward.RES was requested.

Support for MM4_forward.REQ and MM4_forward.RES is mandatory for the MMS Relay/Server.

The participating carriers will make best efforts to deploy the following optional feature in the 23.140 3GPP standard their networks and their vendors' networks. For failure conditions, the terminating MMSC shall respond with a MM4_forward.RES, which includes a status code that indicates the reason the MM was not accepted, e.g., no subscription, bad address, network not reachable, etc., if an MM4_forward.RES was requested.

## Read Reply Reports

Read Reply Reports shall be supported over MM4, but this feature is optional and may not be supported by all participating carriers. If a request comes in to a network that does not support the option, the message should still be delivered but the Read Reply Report may not be delivered back to the originating subscriber. Read Reply Report shall be considered and routed back to the client that requested the report as a new MM type Read Report (same functionality as for Read Reply Reports over MM1).

Inter Carrier MMS Messaging Guidelines v.05

# 9   Minimum/Maximum Message Size

If the originating network sends a message that is larger than the agreed upon size, the terminating carrier may not be able to support the delivery of the message. The minimum/maximum size of the message will be variable depending on the media type being sent.

The following message sizes should be used as a reference:

Images: up to 500kb

Audio: up to 100kb

Video: up to 100kb

The message size should be supported at a minimum. It is up to the terminating carrier to handle messages exceeding these limits.

Inter Carrier MMS Messaging Guidelines v.05

## 10 Throttling over MM4

The Carrier Group would like to have both end-to-end and point-to-point throttling capabilities. This is especially desirable in an outage environment where a network element has been "offline" and suddenly floods the other connected networks when it comes back online.

Throttling is defined as flow control – the sender is notified of the ability to begin sending when the receiving network becomes available. The sender is notified of the ability of the receiving network to stop sending the messages.

Inter Carrier MMS Messaging Guidelines v.05

# 11 Legacy Support

### Definition

"**Legacy Customer**" means a subscriber who cannot send or receive a MM, but can receive a text message.

### Requirements

In the event that the intended recipient of an MM is a Legacy Customer, then the terminating carrier shall promptly store the MM upon receipt and send to the Legacy Customer a non-MM text message notifying the Legacy Customer of an inbound MM and directing them to a web site (Legacy Site) to view the MM. This non-MM text message may include, but not be limited to, the originating customer's mobile number populated in the message header field commonly referred to as the "From" field, the URL from which the MM may be viewed/accessed, and any associated message ID and/or password. The recipient customer should be able to reply to this non-MM SMS message as an text message (assuming that their handset capabilities and provisioning allow for MO SMS ).

The terminating carrier shall ensure that the non-MM SMS notification message is prioritized and follows the same delivery and retry schedule of the terminating carrier's intra-carrier non-MM SMS notification messages.

The recipient operator may elect to outsource this functionality.

In addition, with the understanding that the purpose of Inter-Carrier MMS Messaging is to facilitate the exchange of MMS messages between subscribers of different carriers, and recognizing that not all subscribers will have MMS-capable handsets, carriers shall not block replies to an MM from a Legacy site, if a carrier elects to offer this functionality to its Legacy Customers. This reply message may be transmitted via Text or MMS, depending on the carrier's capabilities and business model. Such messages will have the original recipient's mobile number in the "From" field and shall be considered as originating from a mobile handset, as the intent is to reply to a message that was sent to a mobile handset.

The carriers shall make every effort to ensure that Legacy Customers who reply to MMS messages from a Legacy Web site cannot abuse the capability and initiate SPAM-type messaging. For example, the "Reply" functionality shall be limited only to the sender of the MMS.

Inter Carrier MMS Messaging Guidelines v.05

Inter Carrier MMS Messaging Guidelines v.05

# 12 Unsupported Media Type Treatment

Carriers receiving unsupported media types will make best effort to deliver the content to the destination mobile subscriber.

Examples include the delivery of a video file to the non-capable MMS handset.

The Carrier Group will continue to evaluate support of different media types and will update these guidelines accordingly.

# 13 Digital Rights Management (DRM)

All participating carriers agree to support DRM. On a forward-going basis, the responsibility of maintaining the integrity of the content (DRM) will be on the originating carrier's network (this includes the devices as well). This applies to DRM as specified in the MMS standard (TS23.140). It is agreed that if the originating carrier is effective in managing the digital content, then the sender will not be able to send the protected content.

Inter Carrier MMS Messaging Guidelines v.05

# 14 Service Level Agreement

In addition to the recommendations in this document, a carrier may opt to establish Service Level Agreements (SLA) with each peer MMSC/ICV connection. The carrier has ultimate accountability for defining roles of responsibilities for performance, maintenance and levels of support.  It is also understood that provisioning and enforcement of an SLA is typically at the sole discretion of the carrier.

Inter Carrier MMS Messaging Guidelines v.05

# 15 Message Bundling and Unbundling

The goal of the Carrier Group is to deliver the messages, with multiple recipients, as efficiently as possible while maintaining the integrity of the address list and enable the "reply all" capability.

Inter Carrier MMS Messaging Guidelines v.05

# 16 Testing

Testing will be the responsibility of each participating carrier and ongoing testing will be encouraged.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Frederick F. Mumm.

The case number on all documents filed with the Court should read as follows:

## CV11- 2674 PA (FFMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

---

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I. (a) PLAINTIFFS (Check box if you are representing yourself ☒) <br> BRUCE "MAX" DAVIS, an individual | DEFENDANTS <br> AT&T Wireless Services Inc. a Delaware Corporation; Cellco Partnership dba Verizon Wireless a New Jersey Corporation; Sprint Spectrum LP, A Delaware Limited Partnership; T-Mobile, USA a Washington Corporation; TracFone Wireless Inc. A Delaware Corporation: & Does 1 to 10, inclusive. |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br> BRUCE "MAX" DAVIS <br> 30765 Pacific Coast Hwy #273 <br> Malibu, CA 90265 <br> Tel: 424.781.0301 <br> Fax: 888.512.9133 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 USC § 1 et seq.; 15 USC § 45; 15 USC § 4301; Cal Bus & Pro § 17200

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty <br> ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | | | ☐ 465 Other Immigration Actions | | |

**CV11-02674**

FOR OFFICE USE ONLY: Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc. www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, __and__ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ **Date** 3 / 30 / 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com